MADELEINE M. LANDRIEU, Judge.
12Appellant, Jimmie Warner, was indicted for the second degree murder of Mr. Walter Jovel in violation of Louisiana Revised Statute 14:30.1. Following a jury trial, Mr. Warner was found guilty of the lesser included offense of negligent homicide and sentenced to serve a five-year sentence. He has filed the instant appeal of his conviction, alleging two assignments of error.
In his first assignment of error, Mr. Warner argues that the trial court erred when it allowed the State to introduce into evidence an out-of-court statement given by a witness who was called to testify but refused to answer questions asked of her. In his second assignment of error, Mr. Warner argues that the court erred when it allowed the State to introduce certain character evidence. We find no merit in these assignments of error and find no errors patent on the face of the record. Accordingly, we affirm Mr. Warner’s conviction and sentence.
FACTS AND PROCEEDINGS BELOW
In the early morning hours of July 20, 2008, Mr. Walter Jovel was shot and killed at the corner of N. Derbigny and Spain Streets. He was first found by military police officers who happened to be in the area on the evening of the shooting. They observed the victim to be unresponsive, apparently from multiple gunshot wounds. The military police contacted New Orleans police officers who investigated the shooting as a homicide. The investigation led to the arrest of the defendant, Mr. Jimmie Warner.
According to testimony elicited during Mr. Warner’s trial, the victim was found in the driver’s seat of a black truck, lying across the console in a large pool of blood. The car was still running when first responders arrived on the scene, and the car had apparently backed into a street sign. An autopsy later determined Mr. |3Jovel had been shot three times in the left side of his lower abdomen and buttocks and died of massive internal bleeding. The trajectory of the bullets were consistent with Mr. Jovel having been shot through an open door or window of the car, while in the driver’s seat leaning across the front seat toward the passenger side of the vehicle.
In addition to those involved in the investigation, such as police, investigators and the coroner, two witnesses whose testimony is at issue in this appeal were called to the stand: Ms. Nadia Stark and Ms. Laverne King. The defendant’s assignments of error relate to the direct testimony of Ms. Stark and the cross-examination of Ms. King.
MS. STARK
On the evening of the shooting, Detective Nicholas Gernon canvassed the area looking for anyone who might have had information that would assist police in their investigation. He testified during the trial that he knocked on the door of 1703 Spain Street, a double on the corner of the intersection where the shooting occurred. Ms. Nadia Stark came to the door in response to his knock but told Det. Gernon she had been sleeping in the back room of the residence at the time of the shooting and had not heard or seen anything. Detective Gernon did not believe Ms. Stark as she was dressed in regular clothing and she did not appear to have been sleeping. However, he did not ques *813 tion her further at that point because it was shortly after the shooting, approximately 3:00 a.m., and he did not have authority to enter her residence. Det. Gernon gave Ms. Stark’s name to Det. Regina Williams, the officer in charge of the investigation.
Based upon the information received from Det. Gernon, Det. Williams went to 1703 Spain Street and spoke with Ms. Stark. Det. Williams later took a |4recorded statement from Ms. Stark and showed her a photographic lineup, from which Ms. Stark identified the defendant, Mr. Jimmie Warner, as the shooter. Following Ms. Stark’s statement and identification of Mr. Warner, Det. Williams booked Mr. Warner with the murder of Walter Jovel.
On the day before she was called to testify at trial, the court questioned Ms. Stark in the presence of counsel for the state and defense, but outside the presence of the jury. Ms. Stark informed the court that she would not answer any questions at trial, but would invoke her Fifth Amendment privilege.[1] The court then suspended all questioning of Ms. Stark until such time as Ms. Stark’s lawyer could be present. Once Ms. Stark’s lawyer was present, the court allowed the parties to question Ms. Stark about her intentions with respect to giving testimony. The transcript of the proceedings reflects a three-fold purpose for this questioning: to ensure that in the presence of the jury no one discussed another alleged murder in which Ms. Stark’s boyfriend, Seymour Quinn, and the defendant in this alleged murder, Jimmie Warner, were suspects; to determine whether Ms. Stark had the right to invoke her right against self-incrimination; and to determine the admissibility of Ms. Stark’s recorded statement.
During this questioning, Ms. Stark testified that she was in custody for a probation violation in connection with a charge of theft of goods valued over $500 and that she knew Mr. Warner. She then, in response to a question posed by the State, testified that she would invoke her rights under the Fifth Amendment if she were called to testify in Jimmie Warner’s case. The State asked if she was invoking her right because she was concerned that she would be prosecuted for |Bperjury. She responded that she was pleading “the Fifth.” The State asked if she would testify to the truth if the State called her to testify, and she asked to speak with her lawyer. After she conferred with counsel, Ms. Stark responded: “I have not [sic] intention of testifying at all and I plan to plead the Fifth.” She then identified Mr. Warner. The State asked Ms. Stark if she would identify him in court and if she would testify as to the truth of what happened on the night of the shooting. Ms. Stark again conferred with her attorney and then stated: “I don’t plan to testify. I just plan to state my name and my voice on the tape.”
At this point, the court noted that Ms. Stark could not invoke her Fifth Amendment right in front of the jury and ordered the State to question her more fully. The State then asked her: if she saw Mr. Warner kill a Hispanic man in a black truck on July 20, 2008; if she killed the man; if she was at 1703 Spain Street on that night; if she was drinking or taking drugs that night; if she saw the Hispanic man arrive in the black truck; if she saw where the man came from; if she gave a statement to Det. Williams; if the state *814 ment was true; if she knew Mr. Quinn and if he lived at 1703 Spain; for a description of that address; what happened when the Hispanic male pulled up to the scene; who else was on the scene; what she saw when Mr. Warner walked up to the victim’s truck; and if she saw Mr. Warner with a gun, get into the truck, and then get out of the truck. In response to all of these questions, with the exception of two, Ms. Stark responded that she pled “the Fifth.” Ms. Stark only affirmatively testified that that she gave a statement to the police and that she did not kill the man in the black truck.
l„At this juncture, the State filed a motion to compel Ms. Stark’s testimony pursuant to article 439.1 of the Louisiana Code of Criminal Procedure which provides that under certain circumstances a witness who intends to invoke the privilege against self-incrimination may be compelled to give testimony and that any such testimony may not be used against the witness in any criminal case “except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.” The court did not immediately rule on this motion but warned Ms. Stark that it would hold her in contempt each time she invoked the Fifth Amendment if there was no legal basis for doing so. The court then asked Ms. Stark whether she had any pending charges against her; whether she had been offered anything from the State or Mr. Warner for her testimony; and whether anyone had offered her any money or any promise or benefit for her testimony. To each of these questions, Mr. Stark responded “No.” The court then asked Ms. Stark if anyone had told her that “something you may say or any testimony you may give could cause you harm” and whether she had been threatened if she were to give her testimony. As to these questions, Ms. Stark’s lawyer asked for the opportunity to visit with Ms. Stark before she answered.
The court took a brief recess to allow counsel to consult with his client and Ms. Stark soon returned to the witness stand. Still outside the presence of the jury, Ms. Stark testified that she was receiving threats and had informed victim advocates about these threats. According to Ms. Stark, people came to her and told her to “stay out of it because of my son’s sake and I got a one year old son.” Ms. Stark testified that she was afraid to testify because of threats she had received — not threats of prosecution but threats of physical danger. The court then held that 17Ms. Stark she had no privilege against self-incrimination and ordered her to answer the questions asked of her.
In response to questions from the State, Ms. Stark testified that she gave a statement to Det. Williams and that she would be able to recognize her voice on the statement if she heard it. The State then played a portion of Ms. Stark’s recorded statement and Ms. Stark identified her voice. The court asked her if she was scared, and she admitted that she was. The court then declared Ms. Stark a hostile witness which allowed the State to ask leading questions of her. La. C.E. art. 611(C). For reasons unrelated to this appeal, counsel for Ms. Stark was unable to continue to represent her at this point so the court suspended the questioning to allow time to procure another lawyer for Ms. Stark.
The next day, just before Ms. Stark was to be called to the stand in front of the jury, the court again recessed the jury to consider Ms. Stark’s testimony. At this time, counsel for Ms. Stark informed the court that there had been possible contact between Ms. Stark and Mr. Warner while they were being transported to the court *815 from jail that day. The court then reminded Ms. Stark that she could not raise her Fifth Amendment privilege in front of the jury and that she could be held in contempt of court is she failed to answer questions asked of her. The State then called Ms. Stark to the witness stand in the presence of the jury.
Here, Ms. Stark refused to answer any questions asked of her. When asked her name, whether she gave a statement to police and whether she could identify her voice on the recording, Ms. Stark simply refused to respond. When asked by the State whether the defendant, Jimmie Warner, had tried to contact her the night before, she again refused to respond. The State then asked her a series of leading questions regarding the shooting and she, again, had no response. On crossjexami-nation,8 defense counsel only asked Ms. Stark if she was in court because she was serving a sentence for a felony theft conviction. Ms. Stark refused to respond. Defense counsel then noted that Ms. Stark was “not going to answer the questions” and did not ask her any more questions.
After Ms. Stark left the courtroom, the judge recessed the jury and, outside of their presence, declared Ms. Stark “unavailable” pursuant to Louisiana Code of Evidence article 804 A(2) because she persisted in refusing to testify despite an order from the court do so. The court then ruled that the statement Ms. Stark gave to police was admissible pursuant to Louisiana Code of Evidence article 804(B)(7) stating that the “defendant forfeited his constitutional right of confrontation” because the defendant “engaged or acquiesced in wrong doing” that was intended to “and did procure the unavailability” of the declarant (Ms. Stark) and “specifically intended the unavailability to prevent the witness from testifying.” The State then called Det. Williams before the jury to authenticate the recording of Ms. Stark’s statement and played the statement for the jury.
The recording indicated that the statement was taken on December 8, 2008. Ms. Stark stated that she, Seymour [Quinn], Jimmie [Warner] and someone named James were at her apartment at 1708 Spain Street just prior to the murder. Ms. Stark mentioned something about the woman next door, Erica, being outside on her own porch selling cocaine. She said that Jimmie went outside, and she saw him approach a truck that had stopped. She stated that she supposed that Jimmie asked the driver if he wanted anything, and after the two men spoke, Jimmie got into the passenger side of the truck. She stated that she heard shots, and then Jimmie got out of the truck and ran away, hiding the gun. She stated that she kept looking out the window at the truck to see if the driver was alive or dead, and she |ssaw the truck moving after the shooting. She stated that she saw Jimmie with a gun before he got inside the truck. When questioned further, Ms. Stark stated that Jimmie was first standing on the driver’s side of the truck, and then he got in the passenger door, and while he was inside she saw the driver struggling with Jimmie, trying to get the gun. She then changed her account, telling the detectives that Jimmie spoke with the driver, and then got inside the truck. She stated that Jimmie then got back out of the truck, went to the driver’s side, and at that point, it appeared that the driver was trying to get the gun out of Jimmie’s hand. She then heard shots, and Jimmie fled. The truck then backed up onto the curb. She stated that Jimmie hid the gun next to Ms. Keisha’s house, which was across the street from her apartment. Ms. Stark stated that she did not see Jimmie after the shooting.
*816 Ms. Stark said that after Jimmie left, she kept looking at the truck, but she never saw anyone leave it. At some point, she left the window and lay down, and then she got up and saw that the police had arrived. She then went back to bed, and soon officers knocked at her door. She admitted that she told them that she did not see or hear anything because she did not want to get involved. Ms. Stark stated that one or two weeks after the shooting she called Crimestoppers and told the person who took her tip that someone whom she thought was named Jimmie shot the man at the corner of Spain and N. Derbigny. She stated that she described the shooter as tall with big dreadlocks and a cross in the middle of his face.
Ms. Stark admitted in her statement that she went to the police station on the day she gave her statement in connection with a different shooting at the same intersection for which her boyfriend, Seymour Quinn, was in jail. She admitted that while discussing that shooting, she told the officers about the present shooting. |inShe denied giving the officers the information about the present shooting because her boyfriend was in jail and she insisted that her statement accurately set forth what she witnessed. She denied that her statement was the product of any promises or force, and she agreed that its contents were true to the best of her knowledge. She denied that she was under the influence of any drugs, medication, or alcohol while giving the statement.
Mr. Warner contends that Ms. Stark’s statement should have been excluded because it was testimonial in nature and her refusal to answer questions denied him his constitutional right to “confront the witnesses against him.” This argument forms the basis of Mr. Warner’s first assignment of error.
Ms. Laverne King
Mr. Warner’s second assignment of error relates to the testimony of Ms. Laverne King, who was Mr. Warner’s employer at the time of the shooting and called by him as part of his defense. Ms. King testified that she managed a company which provided care for elderly patients and that she had known Mr. Warner since he began to work for the company in February 2008, approximately five months pri- or to the shooting. She testified that Mr. Warner generally worked from 6:00 a.m. to 10:00 p.m. and was assigned to the care of a mentally-retarded male patient: “He helps him to get dressed, fix his meals. He takes care of his personal needs.” On cross-examination, over the defendant’s objection, the State established that Ms. King had known Mr. Warner since February of 2008, that she had conducted a background check prior to hiring him and that that she found Mr. Warner to be “a quality person.” The State then asked Mr. King if she was aware that Mr. Warner had been arrested in 2007 for possession of a stolen automobile, possession of narcotics, and flight from an officer, or that he had been arrested in |n November 2008 for another second degree murder. Ms. King replied that she was not aware of these arrests.
This testimony forms the basis of Mr. Warner’s second assignment of error. He contends that the testimony elicited from Ms. King on cross-examination was inadmissible character evidence in violation of Louisiana Code of Evidence article 405(A).
ASSIGNMENTS OF ERROR
ISSUES PRESENTED
I. Whether admitting the recorded statement of Nadia Stark under the circumstances of this case denied Mr. Warner his constitutional right *817 of confrontation and his constitutional right to a fair trial.
II. Whether allowing the introduction of character evidence against Mr. Warner under the circumstances presented here violated Louisiana Code of Evidence article 405(A)
DISCUSSION
I. Introduction of Ms. Stark’s statement
Mr. Warner contends that the hearsay exception embodied in Louisiana Code of Evidence article 804(B)(7) is inapplicable here as the State did not establish by a preponderance of the evidence the he was the person who threatened Ms. Stark. Mr. Warner further contends that Ms. Stark’s refusal to testify denied him his right of confrontation and thereby denied him his right to a fair trial.
It is undisputed that Ms. Stark’s statement was hearsay as it was a statement made by her out of court and offered in court to prove the truth of the matter asserted. LSA — C.E. art. 801(C). Hearsay evidence is not admissible except as otherwise specified in the Louisiana Code of Evidence or other legislation. LSA— C.E. art. 802. The only exception relevant here is found in Article 804 B(7), which provides:
112B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
[[Image here]]
(7)(a) Forfeiture by wrongdoing. A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.
b) A party seeking to introduce statements under the forfeiture by wrongdoing hearsay exception shall establish, by a preponderance of the evidence, that the party against whom the statement is offered, engaged or acquiesced in the wrongdoing.
Subpart B(7) of this rule was added in 2009 and amended in 2010, and there are no published Louisiana cases that have addressed it. However, here, it is clear that the plain reading of the exception applies to the facts before us. The trial court held the statement admissible because the defendant engaged or acquiesced in wrongdoing. In so finding, the court specifically found that Mr. Warner intended to and did procure Ms. Stark’s absence. Thus, the court found Ms. Stark’s statement admissible under Louisiana Code of Evidence article 804(B)(7).
Mr. Warner asserts that the State did not establish by a preponderance of the evidence, as required by the article, that he was the person who threatened Ms. Stark. He contends that when Ms. Stark testified during the second day of trial, outside of the jury’s presence, that she had received threats of harm if she testified, she did not indicate that Mr. Warner was the person who threatened her.
Article 804(B)(7) does not require that the person who will benefit must be the person who actually threatens a witness. The language of article 804(B)(7) only requires that the person against whom the hearsay is offered “engaged or acquiesced in the wrongdoing.” Notably, once the court informed Ms. Stark that she had no basis to assert her Fifth Amendment right and that the court would hold haher in contempt if she failed to answer questions when she was called before the jury, Ms. Stark answered various questions. Specifically, Ms. Stark, outside the presence of the jury, identified herself and Mr. Warner. She testified that she would, if called before the jury, identify herself, and her *818 voice on the tape. She also testified that she had been threatened and was scared. Then, according to Ms. Stark’s lawyer, as Mr. Warner and Ms. Stark were passing in the jail on the way to court on the day she was to testify in front of the jury, there was “some possible contact between the defendant and Ms. Stark.” It was after this contact that Ms. Stark took the witness stand in front of the jury and refused to answer any questions asked of her. She refused to identify herself; refused to identify Mr. Warner; refused to admit that she gave a statement to the police; and refused to admit that she could recognize her voice on the tape. After the State played a portion of the tape, Ms. Stark refused to identify her voice on the tape.
Considering the totality of the facts below, we cannot say that the trial court erred in finding that the State proved, by a preponderance of the evidence that Mr. Warner “engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the witness.”
Our finding that this hearsay exception was properly applied does not end our inquiry. Mr. Warner asserts that his right of confrontation guaranteed by the Sixth Amendment of the United States Constitution was violated when the court allowed Ms. Stark’s statement to be admitted into evidence without being subject to cross-examination.
The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. State v. Jackson, 03-883 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 852, writ denied, 04-1399 (La.11/8/04), 885 So.2d 1118.
In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court altered the legal landscape of Confrontation Clause analysis involving hearsay by reexamining its holding in Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Under Roberts, the Confrontation Clause did not bar admission of an unavailable declarant’s statement if the statement fell under a “firmly rooted hearsay exception” or bore “particularized guarantees of trustworthiness.” Ohio v. Roberts, 448 U.S. at 66, 100 S.Ct. at 2539. In Crawford, the Supreme Court revisited this issue and held that where “testimonial” statements are at issue, there is no “guarantee of trustworthiness” that can substitute for cross-examination.
In Crawford, the defendant was tried in the State of Washington for assault and attempted murder of a man who allegedly raped his wife. The defendant’s wife was a witness to the incident between the victim and her husband, and after being questioned by police, provided them with a recorded statement. At trial, the wife was unavailable to testify because of the spousal privilege. The State sought to introduce the wife’s statement as a statement against interest. The defendant argued that, notwithstanding state law that allowed the exception, the admission would violate his federal constitutional right of confrontation.
The trial court admitted that statement into evidence, and Mr. Crawford was convicted. The Washington Court of Appeals reversed. It applied a nine-factor test to determine whether Sylvia Crawford’s statement “bore particularized guarantees of trustworthiness and noted several reasons why it did not.” 541 U.S. at 41, 124 S.Ct. 1354. The Washington Supreme Court reinstated the conviction, unanimously 115concluding that, “although Sylvia’s statement did not fall under a firmly rooted hearsay exception, it bore guarantees of trustworthiness.” Id. The United *819 States Supreme Court granted certiorari “to determine whether the State’s use of Sylvia’s statement violated the Confrontation Clause.” 539 U.S. 914, 123 S.Ct. 2275, 156 L.Ed.2d 129 (2003).
In analyzing the concepts of hearsay and the Confrontation Clause, the Crawford court distinguished between “nontestimo-nial” and “testimonial” hearsay. The Court explained that it would be consistent with the Framer’s intent to permit the States flexibility in the development of hearsay law. 124 S.Ct. at 1374. However, with testimonial hearsay evidence, the Court concluded that the Confrontation Clause demands that the declarant be unavailable and that there be a prior opportunity for cross-examination. The Supreme Court rejected its prior analysis in Ohio v. Roberts, which had held that the test for admissibility under the Confrontation Clause was whether the hearsay falls under a “firmly rooted hearsay exception” or bears “particularized guarantees of trustworthiness.” 448 U.S. at 66, 100 S.Ct. at 2539. The Crawford court held that this test departed from the historical principles of the Confrontation Clause and held the standard to be too malleable. Justice Scalia, writing for the majority, noted: “Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because the defendant is obviously guilty.” 124 S.Ct. at 1371.
In reaching its decision that admitting Sylvia’s statement violated Mr. Crawford’s right of confrontation, the Crawford court drew a distinction between testimonial hearsay and nontestimonial hearsay and held: “Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: | ^confrontation.” 124 S.Ct. at 1374. However, the Crawford court recognized certain limited exceptions to the right of confrontation, i.e. those “exceptions that existed at the time of our founding.” One exception particularly noted by the Crawford court was known as “forfeiture by wrongdoing,” first recognized by the Supreme Court in Reynolds.
Thus, the first issue is whether Ms. Stark’s statement is “testimonial.” While the Supreme Court in Crawford specifically declined to fully define “testimonial,” it recognized that the Confrontation Clause applies to “witnesses’ against the accused — in other words, those who bear testimony ... An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.” 541 U.S. at 51, 124 S.Ct. 1354. Internal citations omitted. Thus, the majority concluded that “statements taken by police officers in the course of interrogations” (custodial examinations) are testimonial under a narrow definition of the term.[2]
It is undisputed that Ms. Stark’s statement at issue here was testimonial, and therefore the trial court was correct to consider its admissibility in light of Crawford. A Crawford analysis requires two considerations when testimonial hearsay statements are admitted against an accused: (1) Did the accused have the right to cross-examine the statement? (2) If not, was the statement otherwise admissible pursuant to an exception to the con *820 frontation right that “existed at the time of the founding?” Id. The Crawford court specifically acknowledged that one of the exceptions that existed when our nation was founded was the doctrine of 1,/‘forfeiture by wrongdoing.” Rooted in common law, this doctrine was premised on the principal that a defendant should not be permitted to benefit from his own wrongdoing.
Forfeiture by wrongdoing was first addressed by the United States Supreme Court in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878 Term), a case involving the prosecution for the crime of bigamy. In Reynolds, the trial court allowed the prosecution to introduce testimony from the defendant’s wife from a prior trial because the defendant had procured her absence at his retrial. The Reynolds Court found that the introduction of the wife’s testimony did not violate the defendant’s confrontation right, given the fact that he procured her absence: 98 U.S. at 158:
The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.
This doctrine was more recently discussed in Giles v. California, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). In Giles, the defendant was on trial for the murder of his girlfriend, Brenda Avie. The State of California introduced statements Ms. Avie had made to a police officer responding to a domestic-violence report about three weeks before the shooting. Ms. Avie, who was crying when she spoke, told the officer that Mr. Giles had accused her of having an affair, and that after the two began to argue, Mr. Giles grabbed her by the shirt, lifted her off the floor, and began to choke her. According to Ms. Avie, when she broke free and fell to the |18floor, Mr. Giles punched her in the face and head, and after she broke free again, he opened a folding knife, held it about three feet away from her, and threatened to kill her if he found her cheating on him. Over Mr. Giles’ objection, the trial court admitted these statements into evidence under a provision of California law that permits admission of out-of-court statements describing the infliction or threat of physical injury on a declarant when the declarant is unavailable to testify at trial and the prior statements are deemed trustworthy. Cal. Evid.Code Ann. § 1370 (West Supp. 2008).
Mr. Giles was found guilty as charged and appealed his conviction, alleging among other errors, that the admission of Ms. Avie’s statements against him violated his Sixth Amendment right of confrontation. While his appeal was pending, the United States Supreme Court decided Crawford, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The California Court of Appeal held that admitting Ms. Avie’s statement into evidence against Mr. Giles did not violate the Confrontation Clause as construed by Crawford because Crawford recognized a doctrine of forfeiture by wrongdoing. 19 Cal.Rptr.3d 843, 847 (2004) (officially depublished). It conclud *821 ed that Mr. Giles had forfeited his right to confront Avie because he had committed the murder for which he was on trial, and because his intentional criminal act made Avie unavailable to testify. The California Supreme Court affirmed on the same ground. 40 Cal.4th 833, 837, 55 Cal.Rptr.3d 133, 152 P.3d 433, 435 (2007). The United States Supreme Court granted cer-tiorari at 552 U.S. 1136, 128 S.Ct. 976, 169 L.Ed.2d 800 (2008) to determine whether the California “forfeiture by wrongdoing” law violated the Confrontation Clause.
In Giles, the Supreme Court refused to extend the forfeiture by wrongdoing exception to the hearsay rule to the Giles facts. In reversing the conviction, the 119Court held that in order to admit testimonial hearsay evidence that would fit within the forfeiture by wrongdoing exception, the prosecution must show that the defendant intended to prevent a witness from testifying. 554 U.S. at 361, 128 S.Ct. 2678.
In further support of its holding, the Supreme Court in Giles noted that in 1997, it approved Federal Rule of Evidence Rule 804(b)(6), entitled “Forfeiture by wrongdoing,” which applies only when the defendant “engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.” The Court noted that it previously described this evidentiary provision as a rule “which codifies the forfeiture doctrine.” Id. at 367, 128 S.Ct. 2678 (citing Davis v. Washington, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).
Louisiana’s forfeiture by wrongdoing exception to hearsay was modeled after the Federal Rule. Unlike California’s rule discussed in Giles, our rule is one firmly rooted in a hearsay exception that existed at the time of our founding. It requires a finding that the defendant “ ‘had in mind the particular purpose of making the witness unavailable.’ ” Id. at 367, 128 S.Ct. at 2687. Here, the trial court so found.
This assignment of error is without merit.
II. Admissibility of character evidence
In this assignment of error, Mr. Warner contends that the trial court erred by allowing the State to introduce evidence of his prior arrests as impeachment of evidence of his character or reputation. Mr. Warner argues that the evidence that he dicited from Ms. King on direct examination was not character or reputation evidence, and because he did not take the stand, the State could not refer to any of his arrests.
| jifiThe trial court allowed the State to introduce evidence of Mr. Warner’s arrests pursuant to Louisiana Code of Evidence article 405(A), which provides in pertinent part: “[i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to general reputation only. On cross-examination of the character witness, inquiry is allowable into relevant specific instances of conduct.” (Emphasis added).
As noted by this court in State v. Robinson, 2009-1137, pp. 7-8 (La.App. 4 Cir. 3/24/10), 33 So.3d 1019, 1023:
A witness may be cross-examined on any matter relevant to any issue in the case. La. C.E. art. 611. Character witnesses may be cross-examined concerning relevant specific instances of conduct. La. C.E. art. 405. The State has the right to rebut testimony elicited from a witness by the defense.
In both Robinson and State v. Hurst, 2001-1817 (La.App. 4 Cir. 9/25/02), 828 So.2d 1165, this court found no error in the *822 State’s questions to character/reputation witnesses concerning prior arrests of the defendants. In Robinson, the defense witness testified that she knew the defendant from the neighborhood, and that he performed odd jobs for neighbors, ran errands for them, and generally checked on them. The State then asked the witness if she was aware that he used drugs and had prior convictions for drug offenses, theft, and escaping from police custody. This court found that the defense questions put the defendant’s character at issue, and the State’s questions concerning his prior convictions were proper. In Hurst, defense counsel questioned the defendant’s mother as to whether she ever saw him with a gun or knew him to be violent, both of which she denied. This court found that the State’s cross-examination, which included questions concerning the 12idefendant’s pri- or arrests for armed robbery and possession of cocaine and marijuana, was proper under article 405(A).
In the instant case, the defense called Laverne King, who testified that Mr. Warner worked for her in her business, which offered care for elderly patients. She testified that Mr. Warner worked long hours in 2008, the year of the shooting, and that he was primarily assigned to care for a mentally-retarded man. Ms. King testified that as part of his duties, Mr. Warner helped dress the man, fixed his meals, and took him on outings. This testimony was clearly offered as evidence of Mr. Warner’s character. On cross-examination, the prosecutor asked Ms. King if she had conducted a background check on Mr. Warner before hiring him. She indicated that she had, and that she had found Mr. Warner to be “quality person.” The prosecutor then asked her if she was aware that Mr. Warner was arrested in 2007 for possession of a stolen automobile, possession of narcotics, and flight from an officer, and in 2008 for another murder. Ms. King answered that she was not aware of these arrests.
Mr. Warner asserts that his counsel’s questions to Ms. King were not to show his character; thus, the State’s questions concerning his arrests did not fall within the ambit of article 405. However, this court finds no purpose to Mr. Warner’s questions to Ms. King other than to show positive aspects of his character. Questions about his care of a mentally-retarded man and the long hours he worked were not pertinent to the shooting, nor were they an attempt to provide an alibi for the time of the shooting. The trial court did not err by finding that defense counsel’s questions placed Mr. Warner’s character at issue and by finding that the State’s questions concerning Ms. King’s knowledge of his prior arrests were proper under article 405. This assignment has no merit.

\ ^CONCLUSION

Although Ms. Stark’s statement was testimonial in nature, and she was declared unavailable at trial due to her refusal to testify, the trial court properly ruled that her recorded statement was admissible under the forfeiture by wrongdoing exception to Louisiana Code of Evidence article 804(B)(7). In addition, because defense counsel’s questions to a defense witness raised the issue of Mr. Warner’s character, the State did not err by asking that witness about her knowledge of Mr. Warner’s prior arrests. Thus, neither of the assignments of error has merit. Accordingly, Mr. Warner’s conviction and sentence are affirmed.
AFFIRMED

. At this point in time, the court was aware that Ms. Stark had given a recorded statement to the police after Ms. Stark had approached the police to discuss a separate murder that her boyfriend, Seymour Quinn, and Mr. Warner were accused of committing.

. As other examples of testimonial statements, the Crawford court lists affidavits, depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. The Supreme Court also refers to statements that were made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. Id. at 1364.