

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1292-19

**FREDERICK L. BROWN , Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPELLANT 'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE SIXTH COURT OF APPEALS
## GREGG COUNTY

KELLER, P.J., delivered the opinion of the Court in which HERVEY, RICHARDSON, NEWELL, KEEL, WALKER, SLAUGHTER, and MCCLURE, JJ., joined. YEARY, J., filed a dissenting opinion.

When the alleged victim of a family-violence assault failed to show up for trial, the State sought to introduce her prior out-of-court statements about the assault. Appellant objected on the basis of his constitutional right to confrontation.[1] The State claimed that the evidence was admissible under the doctrine of forfeiture by wrongdoing. The State produced evidence that

---

[1] U.S. CONST. amend. 6 ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.").

Appellant had told an investigator that he did not know the alleged victim's whereabouts, but the investigator was later able to locate her before trial. Aside from that evidence, the State offered evidence that Appellant lived with the victim shortly before or at the time of trial, that he committed the instant family violence assault offense, and that he had previously committed such an offense against the same victim. We conclude that this evidence is not sufficient to show that an action by the defendant caused the victim's absence. Consequently, we hold that the doctrine of forfeiture by wrongdoing does not apply in this case.[2]

## I. BACKGROUND

### A. Trial

In June of 2018, police officers responded to a neighbor's 911 call reporting domestic violence. The victim of the assault, Lorie Hutzelman, told the officers that Appellant had struck her repeatedly with a broom and had choked her. As a result, Appellant was indicted for family-violence assault against Hutzelman.[3] Appellant had previously been convicted of family-violence assault against Hutzelman.

---

[2] We express no opinion on whether the State would have otherwise met the requirements of the doctrine of forfeiture by wrongdoing. We hold only that the State has failed to satisfy a necessary requirement for applying the doctrine. For example, Appellant contends that the State failed to show that the alleged victim was "unavailable" for purposes of the doctrine. We need not address that contention.

[3] The indictment alleged that Appellant did "intentionally, knowingly, or recklessly cause bodily injury to Lorie Hutzelman, a member of the said Defendant's family and household and with whom the said Defendant has had a dating relationship . . . by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the said Lorie Hutzelman by applying pressure to the throat or neck and blocking the nose or mouth of the said Lorie Hutzelman, and before the commission of the offense, the Defendant had previously been convicted of an offense under Chapter 22, Penal Code, against a member of the said Defendant's family and household and with whom the said Defendant has had a dating relationship. . ." *See* TEX. PENAL CODE § 22.01(a)(1), (b)(2), (b-3).

On April 8, 2019, Hall Reavis, an investigator for the District Attorney's office, went to Hutzelman's last known residence to serve a subpoena for her to be a witness at Appellant's trial. Appellant answered the door. Reavis asked if Hutzelman lived there, and Appellant said "no," that they had "busted up," and that he had "no idea where she was at." When asked how long it had been since he had seen her, Appellant's response was (by Reavis's account) "kind of elusive" and "didn't give a real specific time." Reavis asked, "Well, if you were going to have to try to find her, where would you look?" Appellant answered that she was from Ohio or had family there.

Reavis returned to the residence the next day. He waited until he saw Appellant leave, and then he went to the door and knocked. No one answered, and Reavis left his card in the door.

In an attempt to locate Hutzelman, Reavis looked her up on Facebook. Appellant was included in the profile picture for Hutzelman's Facebook page, and below Hutzelman's profile name were the words, "Together We Stand Strong." An April 1st posting on her Facebook page stated, "Me and my baby at the scrapyard," and linked to a video of Hutzelman and Appellant.

On April 12, Reavis saw Appellant in the hallway outside the courtroom awaiting docket call. Apparently seeing an opportunity to reach Hutzelman without Appellant around, Reavis returned to the residence. This time Hutzelman answered the door.[4] When Reavis said he had a subpoena from the district attorney's office, Hutzelman slammed the door on him. Reavis called out that Hutzelman had been served with a subpoena and that she had to "be at court next Monday." He told her that he was leaving the subpoena between the screen door and the front door, and he did so and left.

Hutzelman did not appear in court. Before the jury heard any evidence, the trial court

---

[4] Reavis recounted that he had knocked loudly several times without anyone answering the door but that Hutzelman answered the door as he started towards his vehicle.

considered the admissibility of her statements to the police about the offense. Appellant contended that the statements were inadmissible on Confrontation Clause grounds. The State argued that the Confrontation Clause did not apply because the statements were not testimonial and because Appellant waived his Confrontation complaint under the doctrine of forfeiture by wrongdoing.

The trial court initially expressed skepticism that the State had shown forfeiture by wrongdoing. This skepticism focused, at least in part, on whether the State had shown that Appellant engaged in any conduct that caused the witness to be unavailable.[5] Ultimately, however, the trial court ruled in the State's favor on the issue, saying, "I'm going to find that he did, by preponderance of the evidence, engage in conduct that is wrongdoing and allow these statements to come in. And I base that on prior assault family violence, their prior conduct, and his being untruthful with the investigator . . . . I just think that their past conduct, them living in the same residence and his lying to the investigator, by preponderance, I believe that's wrongdoing under 38.49."

**B. Appeal**

Appellant claimed on appeal that the State failed to show by a preponderance of the evidence

---

[5] The following questions by the trial court illustrate its skepticism in that regard:

"What in this case did the defendant do or not do to keep the witness from testifying?"

"So how does him lying to Mr. Reavis cause her to be unavailable? She got served, and then what was it after she was served that the defendant did or did not do to make her unavailable?"

"This Gonzalez case says the forfeiture doctrine does not apply because there's no casual link between the defendant's misconduct and the witness's unavailability. I think there has to be a link."

"I know, but I don't have any evidence before me that he even talked to her."

that he procured Hutzelman's unavailability to testify at trial.[6] The court of appeals disagreed.[7] It remarked that just seven days before the first attempt by Reavis to contact Hutzelman, Hutzelman's Facebook post depicted her and Appellant together, standing strong.[8] But on that first attempt, the court observed, Appellant told Reavis that he and Hutzelman were no longer together and that he did not know how to locate her.[9] The court further observed that Hutzelman answered the door only four days later and that she evidently shared the residence with Appellant.[10] The court of appeals found that this evidence indicated that Appellant "deceived Reavis about the status of his relationship with Hutzelman in an attempt to thwart Reavis' efforts to serve Hutzelman with the subpoena."[11]

The court of appeals also pointed to Appellant's prior family-violence assault against Hutzelman and to the United States Supreme Court's recognition that a history of domestic violence can be relevant to whether forfeiture by wrongdoing has occurred.[12] The court of appeals concluded that the trial court acted within its discretion in finding forfeiture by wrongdoing based on Appellant's "actions in trying to hinder service and on the parties' prior relationship in which Hutzelman was assaulted."[13] The appellate court further concluded that the trial court "could infer

---

[6] *Brown v. State*, No. 06-19-00082-CR, 2019 Tex. App. LEXIS 10293, *7 (Tex. App.—Texarkana November 27, 2019).

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.* at *8

[11] *Id.*

[12] *Id.* at *8-9

[13] *Id.* at *9.

that Hutzelman's sharply negative response to Reavis when she opened the door to him resulted from her fear of cooperating in the prosecution of the case."[14]

## II. ANALYSIS

### A. Law

Forfeiture by wrongdoing was originally a common law doctrine that permitted the introduction of statements of a witness who was "detained" or "kept away" by the "means or procurement" of the defendant.[15] We have held that this doctrine, if met, exempts a statement from the restrictions of the Confrontation Clause.[16] Article 38.49 purports to codify the doctrine and provides in relevant part:

> A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:
>
> (1) may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence and testimony; and
>
> (2) forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing.[17]

The Supreme Court has explained that the forfeiture rule applies only when the defendant's conduct is "*designed* to prevent the witness from testifying."[18] The Court further stated that, without such a rule, there would be "an intolerable incentive for defendants to bribe, intimidate, or even kill

---

[14] *Id.*

[15] *Giles v. California*, 554 U.S. 353, 359 (2008).

[16] *Gonzalez v. State*, 195 S.W.3d 114, 124-26 (Tex. Crim. App. 2006).

[17] TEX. CODE CRIM. PROC. art. 38.49(a).

[18] *Giles*, 554 U.S. at 359 (emphasis in original).

witnesses against them."[19]  But, it said, there is "nothing mysterious about courts' refusal to carry the rationale further,"[20] i.e., beyond conduct that is designed to prevent a witness from testifying.

The Supreme Court emphasized that the standards for finding forfeiture by wrongdoing do not change because a case involves domestic violence; there is not a "special, improvised, Confrontation Clause for those crimes that are frequently directed against women."[21]  Although "[d]omestic violence is an intolerable offense that legislatures may choose to combat through many means—from increasing criminal penalties to adding resources for investigation and prosecution to funding awareness and prevention campaigns . . . for that serious crime, as for others, abridging the constitutional rights of criminal defendants is not in the State's arsenal."[22]

Nevertheless, the Court concluded that domestic violence conduct may sometimes be relevant to determining whether particular conduct was designed to prevent a witness from testifying:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions.  Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine.  Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.[23]

---

[19]  *Id*. at 365.

[20]  *Id*.

[21]  *Id.* at 376.

[22]  *Id.*

[23]  *Id.* at 377.

The Supreme Court of Minnesota has summarized what the State must prove after *Giles*: "(1) that the declarant-witness is unavailable, (2) that the defendant engaged in wrongful conduct, (3) that the wrongful conduct procured the unavailability of the witness and (4) that the defendant intended to procure the unavailability of the witness."[24]

At least some courts have broadly construed what constitutes "wrongdoing" for purposes of the forfeiture by wrongdoing doctrine. The Supreme Court of Massachusetts has held that marrying the witness can constitute wrongdoing, if done so that the witness can invoke a spousal privilege against testifying.[25] And the First Circuit has held that fleeing the jurisdiction can constitute the requisite wrongdoing if a witness dies of natural causes before the defendant is apprehended.[26] New Mexico's Supreme Court has concluded that the rationale supporting the doctrine suggests that the interest in disclosing relevant information at trial is paramount and that "any significant interference with that interest beyond the exercise of legal rights provided the defendant by the trial or constitution may constitute wrongful conduct."[27] "Various forms of manipulation may satisfy that condition, and it may often be the case that the nature of the conduct is less important than the effect of the conduct on the witness's willingness or ability to testify at trial."[28]

But courts seem to be more restrictive when it comes to defining "procurement," often also characterized as "causation." The New Mexico court concluded that "indirect and attenuated

---

[24] *State v. Cox*, 779 N.W.2d 844, 851 (Minn. 2010)

[25] *Commonwealth v. Szerlong*, 457 Mass. 858, 860, 933 N.E.2d 633, 638 (2010).

[26] *United States v. Ponzo*, 853 F.3d 558, 578-79 (1st Cir. 2017)

[27] *State v. Maestas*, 412 P.3d 79, 88 (N.M. 2018) (internal quotation marks omitted).

[28] *Id.*

consequences will not satisfy the causation condition for purposes of forfeiture."[29] "Even tort law's familiar 'but-for' principle is not typically enough in these cases; other courts have explained something more like a 'precipitating and substantial' cause may be required, and even a determination that the wrongful conduct was 'the real reason' for unavailability."[30] New York's high court has held that it is not enough that the defendant expressed hope that the witness would not testify against him at trial.[31] Rather, the court said that the defendant must have "engaged in misconduct aimed at least in part at preventing the witness from testifying" and that misconduct must have been "a significant cause of the witness's decision not to testify."[32]

At the same time, however, courts have recognized that procurement or causation need not be proven directly, but may be established by inference. The New Mexico Supreme Court so held, and also stated, "In cases involving long-term domestic relationships, various factors may support an inference that wrongdoing has caused unavailability."[33] Nevertheless, the various cases cited by the New Mexico court seem to involve some sort of discrete acts shown to have been committed by the defendant which could be said to have caused the witness's unavailability.[34] New York's high

---

[29] *Id.* at 90.

[30] *Id.* (citations omitted) (citing *United States v. Jackson*, 706 F.3d 264, 266-67 (4th Cir. 2013) and *United States v. Scott*, 284 F.3d 758, 765 (7th Cir. 2002)).

[31] *People v Smart*, 23 N.Y.3d 213, 220, 12 N.E.3d 1061, 1067 (Ct. App. 2014)

[32] *Id.*

[33] *Maestas*, 412 P.3d at 90-91.

[34] *See id.* (citing *United States v. Montague*, 421 F.3d 1099, 1102-03 (10th Cir. 2005) (violation of no-contact order); *People v. Jones*, 144 Cal. Rptr. 3d 571, 575-77 (Cal. Ct. App. 2012) (threatening phone calls from jail); *Roberson v. United States*, 961 A.2d 1092, 1097 (D.C. 2008) (conspirator indicated shortly after the death of the witness that witness had been "taken care of");

court has held that a court "may infer the requisite causation from the evidence of the defendant's coercive behavior and the actions taken by the witness in direct response to or within a close temporal proximity to that misconduct.[35]

Regarding intent, the Supreme Court of Ohio held in *State v. McKelton*, "When an abusive relationship ends in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine."[36] Under those circumstances, the court found "'highly relevant' . . . any evidence of past abuse (or threats) designed to discourage a victim from seeking outside help, as well as evidence of ongoing criminal proceedings where the victim was expected to testify."[37] In *State v. Dobbs*, the Supreme Court of Washington applied the doctrine of forfeiture by wrongdoing when a witness failed to show up for court after the defendant "engaged in a campaign of threats, harassment, and intimidation" against the witness (his ex-girlfriend) "that included a drive-by shooting at her home and warnings that she would 'get it' for calling the police and she would 'regret it' if she pressed charges against him."[38] The Supreme Court of Michigan has suggested that the timing of the wrongdoing is at least

---

*State v. Warner*, 116 So. 3d 811, 814-815, 818 (La. Ct. App. 2013) (anonymous threats to which defendant may have acquiesced). Only *Montague* was a domestic violence case; the other cases involved "additional contexts." *See id.*

[35] *Smart*, 23 N.Y.3d at 220-21, 12 N.E.3d at 1067. The New York court has held that the showing of causation must be by "clear and convincing evidence." *Id.*, 23 N.Y.3d at 220, 12 N.E.3d at 1067.

[36] 70 N.E.3d 508, 546 (Ohio 2016) (internal quotation marks omitted).

[37] *Id.*

[38] 320 P.3d 705, 706 (Wash. 2014) (internal quotation marks omitted).

a relevant consideration: "While the timing of the wrongdoing is by itself not determinative, it can inform the inquiry: a defendant's wrongdoing after the underlying criminal activity has been reported or discovered is inherently more suspect, and can give rise to a strong inference of intent to cause a declarant's unavailability."[39]

### B. Application

Appellant was previously convicted of family-violence assault against Hutzelman, and, if her out-of-court statements to the officers are believed, he committed another family-violence assault against her. But this is not a case where a defendant murdered the victim—an offense that would necessarily cause the victim to be absent from trial. The past commission of family-violence assault offenses does not, standing alone, show that a defendant caused the victim to be absent from trial. In a murder case, a prior history of family violence may show that the murder not only caused the victim's absence, but that it was designed to do so. But without a murder, or some other offense that necessarily causes a victim's absence, there needs to be more than simply the past commission of family-violence assaults to show causation.

The State has not offered evidence that the defendant issued any threats or engaged in conduct otherwise designed to control Hutzelman. In fact, the State has pointed to only two items of investigation-pending conduct committed by the defendant: lying to a State's investigator about Hutzelman's whereabouts and living with Hutzelman.

The State, the trial court, and the court of appeals all concluded that Appellant lied to Investigator Reavis in saying that he did not know Hutzelman's whereabouts. We will assume that the record is sufficient to support that conclusion. Such a lie might be sufficient, under precedents

---

[39] *People v. Burns*, 494 Mich. 104, 116, 832 N.W.2d 738, 745 (2013).

discussed above, to constitute an act of "wrongdoing" under the forfeiture by wrongdoing doctrine, but the act must still be shown to be causally connected to the witness's subsequent unavailability. The investigator was later able to locate Hutzelman, so Appellant's deception did not prevent the State from contacting the witness for the purpose of delivering a subpoena. Hutzelman slammed the door in Reavis's face and refused to talk to him, but we see no logical connection between that event and Appellant's earlier deception about her whereabouts.

The State also contends that this lie showed Appellant's consciousness of guilt and, consequently, that he must have done something to prevent Hutzelman from showing up in court. But aside from living with the victim (which we address below), the State does not point to any conduct toward the victim that would suggest an attempt to discourage or prevent her from testifying. This is not like a murder case where we know someone killed the victim, and we can use consciousness-of-guilt evidence to show it was the defendant. This is a case where we have no evidence that anyone engaged in wrongful conduct that caused Hutzelman not to show up in court, and the State is claiming that the defendant's deception means he must have done something.[40] But a conclusion that Appellant improperly influenced Hutzelman not to show up for court is based on speculation.[41]

---

[40] *See Hacker v. State*, 389 S.W.3d 860, 871-73 (Tex. Crim. App. 2013) (saying, in the course of finding insufficient evidence to support probation revocation, "as with evidence of motive, evidence of perjury can be significant linking evidence when it has been established that a separate crime or wrongful conduct has occurred, but the commission of perjury is not, by itself, sufficient to infer that a separate crime or wrongful conduct has occurred").

[41] *See Dansby v. State*, 398 S.W.3d 233, 242 n.17 (Tex. Crim. App. 2013) ("In the absence of an answer to this definitive question on the record, the trial court may not, in the name of 'discretion,' speculate that Young would have discharged the appellant from the treatment program for the 'other reasons' she mentioned, even if he had taken the polygraph.").

We will also assume that the evidence was sufficient to show that Appellant and the victim were living together at or shortly before trial. The State, the trial court, and the court of appeals seem to be taking the position that Appellant had the opportunity to influence Hutzelman to decide not to show up for court, so he must have done so. But no one has pointed to anything Appellant did during this post-offense, pretrial period that might have influenced Hutzelman's decision, and in fact, there is no evidence that Appellant did anything to try exert such influence.

The court of appeals concluded that a trier of fact could rationally conclude that Hutzelman's act of slamming the door in Reavis's face was due to fear. That is one possible explanation, but it is also possible that the victim and Appellant had reconciled and that the victim had no desire to proceed with the prosecution. The latter explanation would be more consistent with her Facebook posting characterizing Appellant as "my baby" and her Facebook profile saying, "Together We Stand Strong." Also, Appellant was not present when Hutzelman slammed the door because he was at the courthouse. In any event, whether slamming the door—or failing to show up at court—was due to fear or because of a reconciliation, the State did not point to any act by Appellant that might have motivated Hutzelman's conduct. Even the Facebook page and posting do not imply conduct on Appellant's part; it was Hutzelman's Facebook page.

And at some point, Appellant just living his life with the victim is simply not enough, either because such conduct cannot reasonably be considered "wrongdoing" or because any connection between such conduct and the alleged victim's refusal to cooperate is too indirect or attenuated to satisfy the causation requirement. And this is not changed by the fact that the charges against Appellant were for family-violence assault, or by the fact that he had previously been convicted of the same offense. Even when those facts are added to Appellant and Hutzelman living together, and

to Appellant's deception regarding the victim's whereabouts, any conclusion that Appellant improperly influenced Hutzelman to not show up for court remains speculative.

### C. Conclusion

Having concluded that the State did not meet its burden to show that Appellant engaged in conduct that caused the victim's absence, we hold that the doctrine of forfeiture by wrongdoing does not apply to this case. The State has at least one other argument for upholding the admission of the victim's statements, and that is an issue the court of appeals can address on remand. We reverse the judgment of the court of appeals and remand the case for further proceedings consistent with this opinion.


Delivered: March 3, 2021

Publish