[12 NE3d 1061, 989 NYS2d 631]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FLOYD L. SMART, Appellant.

Argued March 24, 2014; decided May 1, 2014

214

**POINTS OF COUNSEL**

*Mark D. Funk,* Rochester, for appellant. After witness Jane Doe invoked her Fifth Amendment privilege to remain silent, the trial court erred in finding that she was unavailable due to defendant's misconduct and in allowing her grand jury testimony into evidence. (*People v Gissendanner,* 48 NY2d 543; *Davis v Alaska,* 415 US 308; *People v Hults,* 76 NY2d 190; *People v Geraci,* 85 NY2d 359; *People v Green,* 78 NY2d 1029; *People v Arroyo,* 54 NY2d 567; *Matter of Holtzman v Hellenbrand,* 92 AD2d 405; *People v Cotto,* 92 NY2d 68; *People v Maher,* 89 NY2d 456; *People v Johnson,* 93 NY2d 254.)

*Sandra Doorley, District Attorney,* Rochester (*Matthew Dunham* of counsel), for respondent. Jane Doe's refusal to testify was the result of defendant's tampering and intimidation. (*People v Geraci,* 85 NY2d 359; *People v Maher,* 89 NY2d 456; *People v Cotto,* 92 NY2d 68; *People v Johnson,* 93 NY2d 254; *People v Arroyo,* 46 NY2d 928; *People v Thomas,* 51 NY2d 466; *Rogers v United States,* 340 US 367; *People v Cantave,* 21 NY3d 374; *People v Havrish,* 8 NY3d 389; *People v Berg,* 92 NY2d 701.)

**OPINION OF THE COURT**

ABDUS-SALAAM, J.

We hold that the record supports the findings of the courts below that defendant procured a witness's unavailability by

wrongdoing and thereby forfeited his constitutional entitlement to the exclusion of the witness's grand jury testimony at trial.

On the evening of October 3, 2008, defendant Floyd L. Smart, his associate Robert Verstreate and his girlfriend, whom we shall call Jane Doe, planned to burglarize a house in the Town of Greece. The three would-be burglars got into defendant's car to drive in search of a target, and Doe fell asleep in the back seat. As Doe would later tell a grand jury, she awoke to discover that the car was idling, sans defendant and Verstreate, in the driveway of an unoccupied house. Suddenly, the owner of the house arrived, and Doe sounded the horn of defendant's car to alert defendant and Verstreate, whom she assumed to be inside, to the owner's return. Defendant and Verstreate emerged from the back of the house and came to the driveway, where they were confronted by the homeowner. When the homeowner questioned the two men about their presence on her property, they claimed that they were visiting a friend in the mistaken belief that he lived there. Defendant and Verstreate rejoined Doe in their car and drove away. The homeowner then entered the house, where she discovered that her belongings had been displaced and that some of her jewelry was missing. The homeowner called the police, who eventually arrested defendant, Verstreate and Doe.

Doe cooperated with the authorities and testified before the grand jury, conveying the account of the burglary set forth above. Doe received full transactional immunity from prosecution concerning all criminal acts described in her testimony. Following Doe's testimony, the grand jurors indicted defendant and Verstreate on a charge of burglary in the second degree (see Penal Law § 140.25 [2]). Subsequently, Doe was released from police custody on bail, and she absconded.

On February 23, 2009, the People appeared in County Court and sought permission to admit Doe's grand jury testimony into evidence, alleging that defendant had forfeited his right to preclude the admission of that testimony by tampering with Doe. County Court held a hearing to determine the admissibility of Doe's grand jury testimony pursuant to *People v Geraci* (85 NY2d 359 [1995]) and *Matter of Holtzman v Hellenbrand and Sirois (Sirois)* (92 AD2d 405 [2d Dept 1983]).

At the hearing, investigators from the local sheriff's department and the district attorney's office testified that Doe was a

drug addict with a history of prostitution, and as a result of criminal activities that were apparently unrelated to the instant case, four warrants had been issued for Doe's arrest. During the roughly two weeks between Doe's absconding and the start of the *Sirois* hearing, the investigators made extensive efforts to obtain Doe's appearance at trial. In particular, the investigators attempted to subpoena Doe at numerous addresses where she, her parents or her friends were known to have lived, and they called various telephone numbers associated with Doe and tried to learn her whereabouts from other police sources. However, the investigators' efforts proved unsuccessful, and Doe remained at large.

The People also put into evidence recordings of defendant's jailhouse telephone conversations which had occurred between Doe's disappearance and the hearing. The recordings showed that, on the day on which the investigators started searching for Doe, defendant called her and inquired as to whether she would testify against him at trial. When she suggested that she would do so, defendant stated, "I'm going to [w]ring you[r] fucking neck," and Doe replied, "I got to get the fuck outta here." Defendant responded, "[T]hat's a good idea." Doe told defendant that she loved him, and he said, "[W]e will find that out at the last week of this month."[1] Later that day, defendant asked Doe, via telephone, why she was going to "give them [his] life" and "throw [his] life away." Doe answered, "[N]othing much I can do except not show up."

In the recorded telephone calls, defendant also had conversations with his mother which revealed that his mother was watching over Doe at his behest. In some of those conversations, defendant expressed his belief that he would avoid conviction if Doe did not appear at trial, and he urged his mother to either send Doe to visit her own mother in another state or to drive Doe elsewhere. However, in a later call, defendant's mother reported that Doe had deserted her, leaving her unaware of Doe's whereabouts. At this, defendant berated his mother for failing to effectively chaperone Doe and remove her from the reach of the authorities, saying:

> "[U]nless if she calls you and you put her in that
> car and drive[,] you hit that New York line[,] then

---

**1.** At some point during this conversation, defendant also suggested that Doe turn herself in to the police, and Doe declined, indicating that she feared suffering from withdrawal symptoms in police custody as a result of her recent drug use.

she's gonna[,] [i]f you don't do that she's gonna be at trial . . . now they wanted to do my trial in June. I didn't want to hold off until June because I thought you had it under wraps. That's why I called you this morning. . . .

"[I]f she gets a hold of you[,] you need to get her in the mother fucking car and go. . . .

"[S]he's gotta go, use the fucking credit card, I don't give a fuck, go to Florida, wherever you got to go. . . .

"[I]f you can't do that they gonna bury me. If you can't get her out somewhere it ain't never gonna work."

In a subsequent series of calls, defendant's mother stated that she was trying to contact Doe to "keep her off the streets until her mother g[o]t[ ] here," and when defendant asked whether Doe was going to appear at trial, defendant's mother indicated that Doe might not appear. However, defendant's mother "[did]n't wanna say" more on that subject "over the phone." In telephone conversations in the days leading up to the hearing, defendant expressed his belief that Doe would testify against him at trial and said that he no longer cared whether she showed up in court. Defendant's mother told him that Doe was "laying low so they c[ould]n't summons her," but defendant insisted that Doe would appear because she was working with the authorities.

The People presented most of the recorded telephone conversations and other evidence on the first day of the hearing. On the morning of the second day of the hearing, defense counsel announced that Doe was once again in police custody.[2] Defense counsel asserted that Doe was now available to testify at trial and that therefore her grand jury testimony could not be used against defendant. The prosecutor, apparently learning of this development for the first time, expressed skepticism about the timing of Doe's return to police custody, noting that it was "very coincidental given the fact that [the parties] were in the middle of a hearing" about "the possibility of her Grand Jury testimony being used against the defendant." At the prosecutor's urging,

---

**2.** The record does not indicate whether the police located and arrested Doe in the course of their investigation or she turned herself in.

the court continued the *Sirois* hearing, stating that Doe might still refuse to testify and that, "if the Court d[id] find by clear and convincing evidence that [defendant] [wa]s responsible for that, then [the court] w[ould] deal with it at that time." The hearing resumed and the People presented the remainder of their evidence.

Later at the hearing, Doe's attorney appeared in court. According to Doe's counsel, she had told him that she would assert her Fifth Amendment privilege against self-incrimination and refuse to testify at defendant's trial. Counsel initially suggested that Doe wanted to avoid testifying because she had not received immunity from any perjury prosecution that might arise as a result of her testimony at the hearing and at trial. Doe's lawyer noted, however, that his client's stance was puzzling in light of the immunity she had received with respect to the serious burglary charges in this case, and that Doe might not fully understand the implications of her choice. Doe's counsel explained that she had "made adamantly clear to [counsel] she ha[d] no intention of testifying," adding, "[I]mmunity, no immunity, whichever, she does[,] she does not intend to testify." Doe's attorney later reiterated that she had "repeatedly made clear her intention to not offer any testimony no matter what is it [sic] said to her by anybody." Doe did not appear in court to explain her refusal to testify, and the parties agreed to allow Doe's counsel to leave the courtroom without further inquiry.

After hearing extensive argument from the parties regarding whether the People had proved that defendant had wrongfully procured Doe's unavailability by coercing her into invoking her Fifth Amendment privilege, the court granted the People's motion to admit Doe's grand jury testimony into evidence at trial. After summarizing the hearing testimony and the telephone calls, the court found that defendant, "acting in concert with his mother[,] pressured the witness's unavailability up to today through threats and chicanery, among other things, encouraging his mother to keep [Doe] away from trial." Commenting on one of the recorded telephone conversations between defendant and Doe, the court said, "Obviously, [this shows] the influence of the defendant on this woman." The court noted: "The fact she is here is moot [sic]. [Doe's lawyer] stated on the record she is not going to testify. She is so unavailable." The court concluded that the People had more than carried their burden at the hearing, saying, "The Court finds this is beyond a reasonable doubt." At the end of the *Sirois* hearing, the court

granted codefendant Verstreate's severance motion and severed his trial from defendant's.

At trial, the People submitted Doe's grand jury testimony for the jury's consideration, and they called the owner of the burglarized home to the stand. Defendant attempted to call Doe to the stand, and she refused to testify on Fifth Amendment grounds, sobbing as she left the stand. Defendant then testified on his own behalf, claiming that Doe had burglarized the house. According to defendant, he and Verstreate had been returning the property stolen by Doe when the homeowner confronted them.

The jury returned a verdict convicting defendant as charged. Defendant filed a motion to set aside the verdict pursuant to CPL 330.30, renewing his argument that the court had erroneously admitted Doe's grand jury testimony into evidence because Doe had evidently refused to testify to avoid incriminating herself and not in response to defendant's misdeeds. The trial court denied the motion and sentenced defendant to an indeterminate prison term of from 20 years to life. The Appellate Division modified the judgment of conviction as a matter of discretion in the interest of justice, by reducing defendant's sentence to an indeterminate prison term of from 15 years to life, and otherwise affirmed (see *People v Smart*, 100 AD3d 1473, 1473-1476 [4th Dept 2012]). Although two Justices dissented from the court's decision to reduce defendant's sentence (see *id.* at 1476-1480 [Scudder, P.J., dissenting in part]), the court unanimously rejected defendant's contention that the trial court had erred in admitting Doe's grand jury testimony into evidence, reasoning that "[t]he People [had] presented clear and convincing evidence establishing that misconduct by defendant and his mother, who acted at defendant's behest, caused the witness to be unavailable to testify at trial" (*id.* at 1474). A Judge of this Court granted defendant leave to appeal (21 NY3d 914 [2013]), and we now affirm.

Under the Sixth Amendment of the Federal Constitution and article I, § 6 of the State Constitution, a criminal defendant has the right to be confronted with the witnesses against him or her (see US Const Amend VI; NY Const, art I, § 6; *Delaware v Van Arsdall*, 475 US 673, 678 [1986]; *People v Rawlins*, 10 NY3d 136, 146 [2008]). The confrontation right is critical to the fairness of a trial because it " 'ensur[es] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the

trier of fact' " (*People v Wrotten*, 14 NY3d 33, 39 [2009], quoting *Maryland v Craig*, 497 US 836, 845 [1990]). Given this important right, an unavailable witness's grand jury testimony, which by definition has not been subjected to confrontation, generally may not be admitted at trial on the People's direct case (*see Geraci*, 85 NY2d at 365; *see also People v Green*, 78 NY2d 1029, 1030 [1991]). However, "where it has been shown that the defendant procured the witness's unavailability through violence, threats or chicanery," the defendant "may not assert either the constitutional right of confrontation or the evidentiary rules against the admission of hearsay in order to prevent the admission of the witness's out-of-court declarations," including the witness's grand jury testimony (*Geraci*, 85 NY2d at 365-366; *see People v Bosier*, 6 NY3d 523, 527-528 [2006]; *see also Giles v California*, 554 US 353, 359-361 [2008]; *Davis v Washington*, 547 US 813, 833-834 [2006]; *United States v Stewart*, 485 F3d 666, 670 [2d Cir 2007]). This forfeiture rule, as articulated in *Geraci*, is based on sound public policy meant to prevent the defendant from taking advantage of his or her own wrongdoing and to protect the integrity of the proceedings by deterring the defendant from acting on the strong incentive to tamper with adverse witnesses (*see Geraci*, 85 NY2d at 366).

The People may not admit a witness's grand jury testimony into evidence merely because the defendant expressed hope that the witness would not testify against him or her at trial. Rather, the People must demonstrate by clear and convincing evidence that the defendant engaged in misconduct aimed at least in part at preventing the witness from testifying and that those misdeeds were a significant cause of the witness's decision not to testify (*see id.* at 366-368; *People v Maher*, 89 NY2d 456, 462 [1997]).[3] Because witness tampering is a surreptitious activity rarely admitted by the defendant or the witness, few cases will involve direct evidence of this causal link between the defendant's misconduct and the witness's refusal to testify or failure to appear in court (*see id.* at 369; *People v Cotto*, 92 NY2d 68, 76-77 [1998]). Therefore, at a hearing held pursuant to *Sirois* and *Geraci*, the court may infer the requisite causation from the evidence of the defendant's coercive behavior and the actions taken by the witness in direct response to or within a close

---

**3.** Of course, the *Geraci* rule also permits the inclusion of a witness's prior statements in the trial evidence when other individuals acting on the defendant's behalf and with his knowing acquiescence commit misconduct rendering the witness unavailable (*see Maher*, 89 NY2d at 461).

temporal proximity to that misconduct (*see Sirois*, 92 AD2d at 415 [requiring the People to allege facts demonstrating only a "distinct possibility" that defendant's misconduct caused a witness not to testify to obtain a hearing and permitting admission of grand jury testimony upon proof of misconduct and the absence of the witness in a manner suggestive of causation]; *see also People v Encarnacion*, 87 AD3d 81, 85-89 [1st Dept 2011], *lv denied* 17 NY3d 952 [2011]; *see generally Commonwealth v Edwards*, 444 Mass 526, 540-542, 830 NE2d 158, 170-172 [2005]).

Here, the People proved by clear and convincing evidence that defendant committed misconduct, and the court drew a permissible record-based inference that defendant's wrongful actions were designed to prevent Doe from testifying at trial. For example, in recorded telephone conversations, Doe initially indicated to defendant that she might testify, and in response, defendant threatened to "[w]ring [her] fucking neck." Defendant then said that it would be a "good idea" for Doe to leave town. By threatening Doe with violence in response to her avowed willingness to testify and encouraging her to disappear, defendant obviously sought to prevent Doe from testifying at trial and from continuing her cooperation with the police. To achieve that same goal, defendant repeatedly urged his mother to remove Doe from the state so that Doe could not testify against him. Indeed, defendant's telephone conversations with his mother generally indicated that his mother was watching over Doe and giving her drugs at defendant's request to keep Doe away from court.

To be sure, defendant told Doe at one point to turn herself in and eventually expressed resignation to the fact that Doe would appear in court after his mother lost track of her. But those statements merely reflected defendant's recognition that Doe was cooperating with the police and that therefore his efforts to convince her not to testify might prove futile. Even assuming defendant wavered at times in his desire to stop Doe from testifying, the totality of the calls still revealed his desire, at least "in part," to forestall Doe's potential trial testimony (*Maher*, 89 NY2d at 462). Ultimately, the trial court, which was in the best position to choose among competing inferences of intent raised by the evidence, properly concluded that defendant meant to pressure Doe not to testify (*see Cotto*, 92 NY2d at 76-77).

In addition, the record evidence of defendant's misconduct and Doe's responsive actions supports the court's conclusion

that defendant procured Doe's unavailability in the period leading up to the *Sirois* hearing. When Doe told defendant that she planned to testify, defendant threatened to wring her neck, and she immediately responded to his threat regarding her testimony by saying that she would "get the fuck outta here," thus suggesting that defendant's threat had caused her to change her mind about testifying and to consider becoming a fugitive. In a follow-up call, defendant's complaints about Doe's potential testimony again persuaded her not to testify; when defendant accused Doe of trying to "throw [his] life away" by testifying, Doe answered, "[N]othing much I can do except not show up." Thus, the People demonstrated not only that defendant committed misconduct aimed at keeping Doe from testifying, but also that the misconduct had its intended effect insofar as it convinced her not to appear in court.

When viewed in the context of defendant's successful efforts to keep Doe out of court up until the middle of the hearing, Doe's decision not to testify on Fifth Amendment grounds was plainly caused in part by defendant's malfeasance. Initially, as the prosecutor below observed, the timing of Doe's appearance halfway through a *Sirois* hearing tended to suggest that defendant had influenced her to come to court and take the Fifth. On the first day of the hearing, the People presented compelling evidence of defendant's and his mother's attempts to keep Doe out of court, creating the strong possibility that Doe's grand jury testimony would be admitted against defendant on forfeiture-by-wrongdoing grounds. The next day, Doe, who had evaded veteran investigators for weeks and reacted to defendant's threats by promising not to testify, suddenly returned to custody and then asserted her right to remain silent. In doing so, Doe appeared at the perfect moment to save defendant from the impending admission of her damning grand jury testimony, thus lending some credence to the notion that she was continuing to respond to defendant's entreaties by withholding her testimony.

Doe's attorney's statements provided further record support for the inference that defendant's threats and cajoling motivated Doe to refuse to testify. As was evident from her attorney's representations on her behalf, Doe did not refuse to testify solely because she lacked immunity from prosecution for perjury or other charges and thus feared incriminating herself. Regardless of any self-incrimination concern, Doe "made clear her intention to not offer any testimony no matter what" was "said to her by anybody." Taken together with the proof of defendant's

misconduct, Doe's reported admission that fear of self-incrimination was not prompting her refusal to testify logically suggested that she had another motivation: her love or fear of defendant, or both, which he had aroused by his threats and pleas in a deliberate attempt to keep her off the witness stand.

Furthermore, while Doe herself did not tell the court her reasons for refusing to testify, that circumstance did not undermine the evidence that Doe refrained from testifying in response to defendant's misconduct and not just to serve her own interest in avoiding self-incrimination. Doe presumably had authorized her attorney, as her agent (*see People v Brown*, 98 NY2d 226, 231-233 [2002]), to assert the privilege against self-incrimination on her behalf and to state the purported basis on which she had decided to take that action, and thus the court properly relied on the attorney's representations regarding Doe's decision to remain off the witness stand. Indeed, at the *Sirois* hearing, defendant never disputed that Doe's attorney's statements were made at her direction and genuinely reflected her asserted reasons for remaining silent. Thus, it may be assumed that, had Doe appeared in person to answer questions about her invocation of her privilege against self-incrimination, she would have echoed the substance of her attorney's account of her decision, and the court had no reason to demand a ritualistic repetition of those statements from Doe. Given that the existing evidence sufficed to demonstrate that defendant's chicanery caused Doe's unavailability at trial, the People were not obligated to call Doe to the stand to establish the admissibility of her grand jury testimony.

We reject defendant's contention that Doe's grand jury testimony should have been excluded because she had a lawful basis for asserting her Fifth Amendment privilege. The *Geraci* rule is designed to deter improper attempts to induce a witness not to testify, and therefore the rule's application depends on whether the defendant has procured the witness's unavailability and not on whether the witness's refusal to testify would be lawful in the absence of the defendant's illicit influence. Were the rule otherwise, a defendant could effectively suppress a witness's testimony without fear of the evidentiary consequences by holding a gun, proverbial or literal, to the witness's head and demanding that the witness invoke a testimonial privilege which the witness might lawfully assert under different circumstances. We refuse to allow defendants to abuse witnesses' rights for the purpose of unjustly evading *Geraci*'s

sanction in such a manner (see *Edwards*, 444 Mass at 541-542, 830 NE2d at 171-172 [finding that "a defendant's intentional procurement of a witness's unavailability through collusion will constitute a per se wrongdoing sufficient to trigger the doctrine (of forfeiture of the bar against admission of grand jury testimony), even if the collusion is carried out through lawful means"]).

Defendant's remaining arguments are premised on the notion that unless Doe admitted that she was invoking her right to remain silent under pressure from defendant or there was some direct proof that defendant actually instructed Doe to take the Fifth, the trial court could neither blame him for her refusal to testify nor put her grand jury testimony into evidence. However, because the People "often have nothing more to rely upon than circumstantial proof" of the basis for the witness's refusal to testify, "it would be unrealistic and unnecessarily rigid to adopt" the "formula[ic]" requirement of direct evidence or a witness's admission, which "would make it impossible to establish the necessary foundation" for the admission of a witness's prior statements "in so many cases" (*Geraci*, 85 NY2d at 369). Instead, we think it better to follow the flexible approach reflected in certain decisions of the Appellate Division which rely heavily on circumstantial evidence and the sequence of events to determine a defendant's role in compelling a witness not to testify (see e.g. *Encarnacion*, 87 AD3d at 85-89; *People v Clarke*, 55 AD3d 1447, 1448 [4th Dept 2008], lv denied 11 NY3d 923 [2009]). The opinions in those cases comport with the Appellate Division's leading decision in this area, *Sirois*, which establishes a pragmatic framework for the admission of a witness's grand jury testimony based on inferences to be drawn from clear and convincing proof of the defendant's misconduct, the witness's unavailability and the surrounding circumstances, rather than making the defendant's or the witness's admissions an absolute foundational requirement (*Sirois*, 92 AD2d at 415).

Finally, *People v Hamilton* (70 NY2d 987 [1988]), upon which defendant relies, is distinguishable from this case. In *Hamilton*, a witness testified in the grand jury that the defendant had made incriminating statements to her (see *id.* at 988). However, before trial, she told the court that she would not testify on Fifth Amendment grounds (see *id.*). At a *Sirois* hearing, the witness maintained that the defendant had no involvement in her refusal to testify at trial and that the police had pressured her into lying to the grand jury, and the witness's sister corroborated

those assertions (*see id.*). A police officer testified that the police never coerced the witness into testifying in the grand jury (*see id.*). At the hearing, the prosecutor admitted that the witness had told the prosecutor that she had not been threatened by anyone (*see id.*). On that record, we concluded that the witness's grand jury testimony was inadmissible because the People had failed to "produce any evidence that defendant had threatened [the witness]" (*id.*). Here, unlike in *Hamilton*, the People adduced ample evidence at the hearing that defendant had attempted to convince Doe not to testify, including telephone conversations in which he pleaded with her to flee from the authorities who were seeking her presence at trial and threatened to harm her if she testified. Additionally, in contrast to the absence of evidence of causation in *Hamilton*, there was clear and convincing circumstantial evidence here that defendant's entreaties were a cause of Doe's refusal to testify, and thus the trial court properly ruled that defendant had forfeited his right to preclude the admission of Doe's grand jury testimony by his wrongdoing.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge Lippman (concurring). I agree with the majority's conclusion that the record supports the affirmed finding that defendant procured the witness's unavailability through the first day of the *Sirois* hearing. However, the situation changed overnight when the witness appeared in court and asserted her Fifth Amendment privilege against self-incrimination. I write separately because I believe that the trial court failed to focus fully on the relevant issue once she was physically present—whether the witness's refusal to testify was due to defendant's misconduct.

As the majority relates, defendant and his mother plainly set about to prevent the witness from coming to court. Rarely will we have tape-recorded conversations laying out such a roadmap of a campaign of threats and pleas designed to induce a witness to absent herself from trial. However, I am concerned about other aspects of this case. A prosecutor may very well be content with relying on the known, favorable, prior-recorded testimony of an unsavory witness. A defendant's vaunted constitutional right of confrontation can and should be protected in such instances by the vigilance of the trial court.

The purpose of the *Sirois* hearing is to ensure that statements untested by cross-examination will be admitted "only

where the requisite link between the defendant's misconduct and the witness's silence has been established" (*People v Johnson*, 93 NY2d 254, 258 [1999]). Here, by contrast, virtually the entire hearing was devoted to the issue of defendant's responsibility for the witness's *physical* unavailability. Once she actually appeared, rendering the attempt to keep her away from trial unsuccessful, the focus of the court's inquiry should have shifted. At that point, the prosecutor represented that the witness—a subject of open warrants—had been arrested the night before in a highly intoxicated condition. A court presented with this dramatic turn of events might well be behooved to inquire more deeply into the reason behind the witness's refusal to testify, including any basis for her invocation of the Fifth Amendment.

Instead, here, the court made only a brief inquiry of the witness's counsel, who represented that the witness intended to assert her Fifth Amendment privilege. Somewhat to the contrary, he also related that the witness had made clear that she would not testify regardless of whether the People offered her immunity with respect to her testimony at the hearing. He further expressed that he was having some difficulty explaining the situation to her, in light of the fact that she already had transactional immunity for the underlying charges, and noted that it was a "very chaotic" and "stressful" atmosphere.

Without making any direct inquiry of the witness, the court determined that her physical presence was "moot" and found her unavailable based on her refusal to testify. The court held that defendant had "pressured the witness's unavailability up to today through threats and chicanery." Upon this record, the Appellate Division found that the People had presented clear and convincing evidence that defendant and his mother had "caused the witness to be unavailable to testify at trial" (100 AD3d 1473, 1474 [4th Dept 2012]).

Before imposing a forfeiture of a defendant's fundamental right to confrontation, the trial court should make certain that the penalty is warranted (*see People v Maher*, 89 NY2d 456, 461-462 [1997]). However, under the circumstances of this case, where the evidence of witness tampering was overwhelming and there was apparently no valid basis for invoking the privilege against self-incrimination, the satisfaction of *Johnson*'s requirement of a nexus between the defendant's misconduct and the witness's silence is implicit.

Judges GRAFFEO, READ, SMITH, PIGOTT and RIVERA concur with Judge ABDUS-SALAAM; Chief Judge LIPPMAN concurs in result in an opinion.

Order affirmed.