*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered: April 9, 2015 105303
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                    Respondent,

        v                                    MEMORANDUM AND ORDER

JARRIN Q. RANKIN, Also Known
    as FAT BOY,
                    Appellant.
_____

Calendar Date: February 17, 2015

Before: McCarthy, J.P., Egan Jr., Devine and Clark, JJ.

_____

        George P. Ferro, Albany, for appellant.

        D. Holley Carnright, District Attorney, Kingston (Joan Gudesblatt Lamb of counsel), for respondent.

_____

Egan Jr., J.

        Appeal from a judgment of the County Court of Ulster County (Williams, J.), rendered August 24, 2012, upon a verdict convicting defendant of the crimes of criminal possession of a weapon in the second degree (two counts) and criminal possession of a weapon in the third degree.

        Defendant, also known as Fat Boy,[1] was indicted and charged with two counts of criminal possession of a weapon in the second

_____

        [1] Although defendant is referred to throughout the record as "Phat Boy," the indictment lists defendant's alias as "Fat Boy."

degree and one count of criminal possession of a weapon in the third degree.  The charges stemmed from an incident that occurred on November 21, 2009 on Henry Street in the City of Kingston, Ulster County, during the course of which Curtis Williams, also known as Black, was shot in the face.  According to Charles King Jr., he and his brother, Lee Gray, encountered Williams on the street shortly before the shooting, at which time Williams indicated that he had a problem with "Phat Boy."[2]  After speaking with Williams, King and Gray continued walking and thereafter came upon defendant outside of 34-36 Henry Street, at which time they advised defendant "that Black said he was going to shoot him."  In response, defendant said, "Ain't nobody going to do nothing to me or hurt me," pulled out a gun, walked around to the corner of the house and cocked the weapon.  As Williams approached the residence, defendant said, "This is how you want to take it?  This is how far you want to go with it?"  Williams then opened his coat, pulled out a sawed-off shotgun and fired a round.  As King and his brother ran for cover, King saw defendant fire two or three shots in Williams' direction.  Williams was admitted to a local hospital with a gunshot wound to the face, and police thereafter recovered, among other things, a 12-gauge shotgun and various shell casings from the scene of the shooting.

Two days after the shooting, King gave an oral statement to the police and, after reviewing multiple mug shots, positively identified defendant as the individual who possessed a hand gun on the day in question and fired that weapon in the direction of Williams.  The following day, defendant was arrested and, after being advised of his Miranda rights, spoke with detectives and admitted that he had possessed and fired a gun at the relevant point in time in an effort to protect himself from Williams.  King subsequently testified before an Ulster County grand jury in January 2010 and, three weeks later, was shot and killed by

_____

[2]  Although King did not know defendant's "government name," the record makes clear that defendant and Phat Boy are one and the same individual.

defendant's brother, Trevor Mattis.[3]

Defendant's subsequent motion to suppress his oral statement to the police and to exclude both King's photo identification of him and resulting grand jury testimony was denied in all respects. Following a jury trial, defendant was found guilty as charged and thereafter was sentenced to a prison term of 15 years followed by five years of postrelease supervision.[4] This appeal by defendant ensued.

We affirm. Initially, we discern no error in County Court's decision to allow the People to utilize King's grand jury testimony as part of their case-in-chief. As summarized in People v Smart (23 NY3d 213 [2014]), "[u]nder the Sixth Amendment of the Federal Constitution and article I, § 6 of the State Constitution, a criminal defendant has the right to be confronted with the witnesses against him or her. The confrontation right is critical to the fairness of a trial because it ensur[es] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. Given this important right, an unavailable witness's grand jury testimony, which by definition has not been subjected to confrontation, generally may not be admitted at trial on the People's direct case. However, where it has been shown that the defendant procured the witness's unavailability through violence, threats or chicanery, the defendant may not assert either the constitutional right of confrontation or the evidentiary rules against the admission of hearsay in order to prevent the admission of the witness's out-

---

[3] Mattis thereafter was convicted of, among other things, murder in the first degree and conspiracy in the second degree in connection with King's death (People v Mattis, 108 AD3d 872 [2013], lvs denied 22 NY3d 957 [2013]).

[4] In the interim, defendant was convicted of conspiracy in the second degree for his role in King's murder and was sentenced — as a prior violent felony offender — to a lengthy period of incarceration (People v Rankin, 117 AD3d 1231 [2014], lvs denied 24 NY3d 1087 [2014]).

of-court declarations, including the witness's grand jury testimony" (id. at 219-220 [internal quotation marks and citations omitted]; see People v Geraci, 85 NY2d 359, 365-366 [1995]; People v Encarnacion, 87 AD3d 81, 86 [2011], lv denied 17 NY3d 952 [2011]). Before such testimony may be admitted, "the People must demonstrate by clear and convincing evidence that the defendant engaged in misconduct aimed at least in part at preventing the witness from testifying and that those misdeeds were a significant cause of the witness's decision not to testify" (People v Smart, 23 NY3d at 220; see People v Ali, 123 AD3d 1137, 1137-1138 [2014]; People v Encarnacion, 87 AD3d at 86-87). In this regard, the trial court "may infer the requisite causation from the evidence of the defendant's coercive behavior and the actions taken by the witness in direct response to or within a close temporal proximity to that misconduct" (People v Smart, 23 NY3d at 220-221; see People v Geraci, 85 NY2d at 370-371; see also People v Leggett, 107 AD3d 741, 742 [2013], lv denied 23 NY3d 964 [2014]).

Here, the People submitted, among other things, audio recordings of phone calls made between December 2009 and January 2010 while defendant, who was identified as a member of the Bloods street gang, was in jail awaiting trial in this matter. As may be discerned from the subject phone calls, defendant and certain of his cohorts initially believed that it was Gray who had been in contact with the police and, in that regard, defendant warned that Gray "better not be saying nothing to them f***ing . . . police." Similarly, in a phone call with a fellow gang member, defendant — in an apparent reference to King and King's father — stated, "[M]ake sure them [expletive] ain[']t doing nothing either you hear[]?"[5] After defendant was advised that it was King who had implicated him in the shooting, defendant stated, "And tell . . . [Gray] that since that is his

_____

[5] In this and many of the other calls, the individuals in question were identified either by description or their street names. Accordingly, the actual identity of the described individuals, as well as their alleged affiliation with the Bloods gang, was provided by various members of the local police department.

brother that it[']s his job to make sure that s*** don't happen. And if it happens then he's going to be held accountable for it." Similarly, in an apparent reference to King, defendant warned, "[M]ake sure that son stay where the f*** he at and don't resurface, you hear me?" Finally, during a phone call with Mattis, Mattis assured defendant that he had "everything under control" and that he was "gonna go to bat" for defendant. When defendant asked Mattis if Mattis was aware that defendant had been indicted, Mattis replied, "Yeah I know all that[.] [T]hat's why I'm doing what I'm doing now." Less than two weeks later, King was shot to death and, as noted previously, Mattis subsequently confessed to and was convicted of King's murder.

These and other statements made by defendant during the recorded phone calls, coupled with defendant's (and at least one of the caller's) known association with the Bloods gang, defendant's corresponding motivation to prevent King from testifying and King's ensuing demise, "provide[] an example of the type of circumstantial proof that suffices to satisfy the [People's] foundational burden" (People v Geraci, 85 NY2d at 369). In short, based upon our review of the evidence adduced at the subject hearing, we are satisfied that the People demonstrated, by clear and convincing evidence, that "defendant either was responsible for, or acquiesced in, the conduct that rendered [King] unavailable for trial" (People v Ali, 123 AD3d at 1138). Accordingly, County Court did not err in allowing the People to utilize King's grand jury testimony on their direct case.

Nor are we persuaded that County Court erred in denying defendant's motion to suppress his oral statement to police. "The People bore the burden of proving the voluntariness of defendant's statement[] beyond a reasonable doubt, including that any custodial interrogation was preceded by the administration and defendant's knowing waiver of his Miranda rights. Determining whether a statement is voluntary is a factual issue governed by the totality of the circumstances [and] [t]he credibility assessments of the suppression court in making that determination are entitled to deference" (People v Fisher, ___ AD3d ___, ___, 2015 NY Slip Op 01836, *2 [2015] [internal quotation marks and citations omitted]). Here, two detectives

from the Kingston Police Department testified as to the circumstances under which defendant was apprehended, transported to the police station and questioned. In this regard, one of the detectives testified that he advised defendant of his Miranda rights prior to any questioning, and that defendant, in turn, orally indicated that he understood his rights and was willing to speak with the detective. According to the detective who interviewed defendant, defendant thereafter gave an oral statement wherein he placed himself at the scene of the November 2009 shooting, indicated that someone came after him with a gun and asserted that he "did what he had to do to protect himself." Specifically, the detective testified that defendant "demonstrated with one of his hands how he held [the] gun and that he fired [the] gun in hopes of scaring [the victim]." County Court fully credited the relevant detective's testimony on this point and, upon reviewing the transcript of the suppression hearing, we discern no basis upon which to disturb County Court's findings as to the voluntariness of defendant's statement. Contrary to defendant's assertion, the fact that he did not execute a written waiver of his Miranda rights does not invalidate his oral waiver or otherwise render his statement involuntary (see People v Dobbins, 123 AD3d 1140, 1140 [2014]; People v Wilkinson, 120 AD3d 521, 521 [2014]; People v Thornton, 87 AD3d 663, 664 [2011], lv denied 18 NY3d 862 [2011]; People v Saunders, 71 AD3d 1058, 1059-1060 [2010], lv denied 15 NY3d 757 [2010]).

Finally, we find no merit to defendant's claim that King's photo identification of him resulted from unduly suggestive procedures. Based upon King's physical description of "Phat Boy," King was presented with a book containing multiple mug shots of black males and was "asked . . . to look through the photographs . . . to see if he recognized the person who shot [in the direction of the victim]." After reviewing a number of photographs, King selected defendant's picture. To our analysis, the fact that King was asked to review only approximately 20 of the photos contained in the mug shot book does not establish that the identification procedures employed were unduly suggestive. In any event, given that King had known "Phat Boy" for "a month or two" prior to the shooting, his resulting photographic identification of defendant was merely confirmatory (see People v

Stevens, 87 AD3d 754, 755-756 [2011], lvs denied 18 NY3d 861 [2011]).  Under these circumstances, County Court properly denied defendant's motion to suppress King's identification.

McCarthy, J.P., Devine and Clark, JJ., concur.


ORDERED that the judgment is affirmed.




ENTER:

Robert D. Mayberger
Clerk of the Court