People v Ketter
2026 NY Slip Op 03848
June 18, 2026
Appellate Division, Third Department
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

The People of the State of New York, Respondent,
v
Houston Ketter III, Also Known as JD, Appellant.

Decided and Entered:June 18, 2026
CR-24-1420
Calendar Date: April 21, 2026
Before: Garry, P.J., Ceresia, Powers And Mackey, JJ.

Hug Law, PLLC, Albany (Matthew C. Hug of counsel), for appellant.
Lee C. Kindlon, District Attorney, Albany (Emily Schultz of counsel), for respondent.

[*1]
Ceresia, J.
Appeal from a judgment of the County Court of Albany County (Andra Ackerman, J.), rendered December 19, 2023, upon a verdict convicting defendant of the crimes of attempted murder in the first degree, attempted murder in the second degree and assault in the first degree (two counts).
On the evening of November 13, 2022, two police officers driving through the City of Albany encountered a woman (hereinafter victim A) running through the street engulfed in flames. The officers were able to extinguish the fire and victim A survived, but she suffered severe burns over much of her body. It was later determined that an individual had come up behind victim A, doused her with a flame accelerant and lit her on fire. Victim A and a bystander, who both knew defendant as their drug dealer, identified him as the perpetrator.
In February 2023, defendant brought his then-girlfriend (hereinafter victim B) to an emergency room for treatment of second and third degree burns all over her body. During a subsequent investigation, victim B revealed that defendant had heated a pan and assaulted her with it. Victim B also indicated that she knew of victim A, who lived in the same neighborhood as victim B for some time, and that defendant had threatened victim B by telling her that he would use the same bottle of accelerant on her that he had used on victim A.
Defendant was indicted relative to victim A on charges of attempted murder in the first degree, attempted murder in the second degree, and assault in the first degree. The same indictment charged him with an additional count of assault in the first degree with respect to victim B. Following a jury trial, defendant was convicted as charged and sentenced, as a second felony offender, to an indeterminate term of incarceration of 25 years to life for the attempted murder in the first degree conviction. On each remaining conviction, he was sentenced to a determinate term of incarceration of 25 years, to be followed by five years of postrelease supervision. The court directed that the sentences on the three convictions involving victim A run concurrently with each other but consecutively to the sentence on the conviction involving victim B. Defendant, therefore, received an aggregate prison sentence of 50 years to life. Defendant appeals.
Initially, defendant contends that his conviction for attempted murder in the first degree is not supported by legally sufficient evidence and is against the weight of the evidence because the People failed to prove that he engaged in a "course of conduct" or that he "relished" inflicting extreme physical pain upon victim A, both elements of this crime. Although the legal sufficiency arguments are unpreserved for appellate review, when evaluating a weight of the evidence challenge, we necessarily determine "whether all elements of the charged crimes were proven beyond a reasonable doubt" (People v Lerario, 246 AD3d 1281, 1283 [3d Dept 2026] [internal quotation marks and citations omitted[*2]]; see People v Agan, 207 AD3d 861, 863 [3d Dept 2022], lvs denied 38 NY3d 1186 [2022], 39 NY3d 939 [2022]). Examining the weight of the evidence requires us to "view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Harris, 246 AD3d 1293, 1294 [3d Dept 2026] [internal quotation marks and citations omitted]; see People v Bleakley, 69 NY2d 490, 495 [1987]). In so doing, we accord significant deference to the jury's credibility determinations (see People v Bleakley, 69 NY2d at 495; People v Bessette, 246 AD3d 1310, 1310 [3d Dept 2026]).
A person is guilty of attempted murder in the first degree when, with the intent to cause the death of another person, they attempt to cause the death of such person and, as relevant here, they "act[ ] in an especially cruel and wanton manner pursuant to a course of conduct intended to inflict and inflicting torture upon the victim" (Penal Law § 125.27 [1] [a] [x]; see Penal Law § 110.00). In People v Estrella (41 NY3d 514 [2024]), the Court of Appeals explained that, to satisfy the course of conduct element of this "torture murder" subparagraph, the People must demonstrate "a series of distinct acts before the victim's death that are intended to inflict and actually inflict extreme physical pain" (id. at 519). The Court of Appeals made it clear that, in order to satisfy this standard, it is not enough that only the ultimate fatal act result in such pain (see id.). Further, actions such as planning and stalking cannot be considered part of the course of conduct insofar as they do not cause physical pain (see id.).
Here, assuming arguendo that defendant engaged in a series of distinct acts when he threw accelerant on victim A and then immediately lit her on fire, the evidence nevertheless fails to sustain the subject crime because the act of dousing victim A with accelerant cannot be said, under the particular facts of this case, to have caused her extreme physical pain. To be sure, the evidence plainly revealed the deplorable purpose behind throwing accelerant on victim A, and it would be difficult to imagine such an act not leading to psychological terror. However, such circumstances do not equate to the requisite physical pain (see id.). While the remaining act of setting victim A on fire obviously led to extreme physical pain, a single act does not comprise a course of conduct (see id.). Accordingly, we are constrained to conclude that the conviction on this count is against the weight of the evidence (see People v Goodman, 231 AD3d 1366, 1369 [3d Dept 2024]; People v Smith, 206 AD3d 1058, 1062 [3d Dept 2022]). Given this holding, defendant's claim concerning the sufficiency of the element involving relishing the infliction [*3]of physical pain has been rendered academic.
With respect to the remaining counts, defendant did preserve his argument that the evidence was legally insufficient to establish his identity as the perpetrator of the two incidents (see People v Dillon, 231 AD3d 1352, 1354 [3d Dept 2024]). This contention, however, is without merit. As noted above, the People presented testimony from both victim A herself and a bystander, each of whom knew defendant as their drug dealer and saw that it was defendant who lit victim A on fire. In addition, the People submitted cell phone activity records and video evidence connecting defendant to the scene. Regarding victim B, whose grand jury testimony was presented at trial, she also identified defendant, with whom she had been in a romantic relationship, as the person who caused her burn injuries. This evidence, viewed in the light most favorable to the People, was legally sufficient to establish defendant's identity with respect to each of these counts (see People v Quinn, 210 AD3d 1284, 1285 [3d Dept 2022], lv denied 39 NY3d 1079 [2023]). As for the weight of the evidence, a different verdict would not have been unreasonable given that certain DNA evidence was inconclusive, there were some inconsistencies in the testimony of victim A and the bystander, and the jury was unable to evaluate victim B's credibility directly since she did not testify in person during the trial. Still, these issues were explored by defense counsel and, deferring to the jury's credibility assessments, we find that the remaining convictions are supported by the weight of the evidence (see People v Cruz, 238 AD3d 1327, 1330-1331 [3d Dept 2025], lv denied 43 NY3d 1054 [2025]).
Next, we are satisfied that the People met their "heavy burden" of demonstrating, by clear and convincing evidence, that defendant caused victim B's unavailability at trial, such that her grand jury testimony was admissible on the People's case-in-chief (People v Cotto, 92 NY2d 68, 76 [1998]; see Matter of Holtzman v Hellenbrand, 92 AD2d 405 [2d Dept 1983]). In general, the use of grand jury testimony, and other out-of-court statements, as evidence against a criminal defendant violates their constitutional right of confrontation under the Sixth Amendment to the US Constitution (see People v Smart, 23 NY3d 213, 219-220 [2014]). The People, however, may demonstrate that the defendant forfeited this right by presenting "evidence that the defendant engaged in misconduct aimed at least in part at preventing the witness from testifying and that those misdeeds were a significant cause of the witness's decision not to testify" (People v Smart, 23 NY3d at 220; see People v Geraci, 85 NY2d 359, 366-368 [1995]; People v Kellum, 233 AD3d 1374, 1377 [3d Dept 2024], lv denied 44 NY3d 983 [2025]). A witness's silence may be procured through violence, chicanery, intimidation, bribery or the use of a relationship (see People v Encarnacion, 87 AD3d 81, 86 [1st Dept 2011], lv denied 17 [*4]NY3d 952 [2011]), whether by the defendant personally or by "others on his or her behalf with the defendant's knowing acquiescence" (People v Maher, 89 NY2d 456, 461 [1997]). "[G]iven the inherently surreptitious nature of witness tampering, the proponent of [g]rand [j]ury testimony or other hearsay evidence will often have nothing more to rely upon than circumstantial proof" (People v Geraci, 85 NY2d at 369; see People v Cotto, 92 NY2d at 76-77). Thus, courts may "rely heavily on circumstantial evidence and the sequence of events to determine a defendant's role in compelling a witness not to testify" (People v Smart, 23 NY3d at 224), including opportunity, timing and prior intimidation (see People v Cotto, 92 NY2d at 77 n 1).
Here, the People requested and were granted a mid-trial Sirois hearing to explore whether defendant had brought about victim B's unavailability. At the hearing, the lead detective assigned to the investigation testified that he was in constant contact with victim B — two or three times a week — from February 2023 until she stopped communicating with him in early October 2023, approximately two weeks before defendant's trial. During a "majority" of these conversations, victim B expressed significant concern for her safety if she cooperated in this case, explaining that defendant was communicating from jail with people on the street whom he might send after her, and he was also telling victim B directly in phone calls from the jail that "he knew what she did," such that she was fearful that defendant suspected her cooperation. A victim advocate who had extensive interactions with victim B throughout the investigation similarly testified that victim B was afraid for her life if she testified against defendant and that she was being threatened by individuals at defendant's direction. As a result, victim B was relocated to a safer living arrangement in the months leading up to trial.
Significantly, the hearing evidence also revealed that, two weeks before trial and just one day after the detective's last conversation with victim B, a protective order was lifted and defendant was provided with the People's discovery materials. Two days later, defendant was heard in a recorded jailhouse phone call discussing with his uncle the People's evidence, including statements given by the victims. In that phone call, defendant talked about how his potential sentence would be shorter if certain witnesses did not testify, referring to one individual by the nickname "JuJu." Defendant spoke about JuJu, or Ju, in a number of recorded calls and, although he sometimes used male pronouns when speaking about this person, there was ample evidence at the hearing that the nickname was meant to refer to victim B. For example, there was discussion of JuJu being arrested in Saratoga and not having any identification, both facts that were true of victim B. Also, in one phone call, defendant told the person to whom he was speaking to put Ju on the phone, and [*5]the voice that then came on the line was identified at the hearing as belonging to victim B.
In another call between defendant and the uncle, the uncle stated, "Ju gotta go." When apparently formulating a plan involving Ju, defendant indicated that if the plan was successful, he would be "halfway home." During a subsequent call, the uncle stated that he "might have to wait until the last minute" because JuJu had been avoiding him. Defendant was heard in a later call repeatedly stating, "what's-her-name gotta bounce," and the uncle, in turn, reassured defendant, "don't worry, I got that, you ain't gotta say it." Two days before the trial began, defendant once again spoke to the uncle, telling him that meeting up with Ju was the "main ingredient in the recipe." That same day, the uncle communicated with victim B via text message, asking her to meet him at a specific location. Ten minutes later, surveillance footage of that location depicted victim B walking with a man who held her arm and then assisted her into the front passenger seat of a car. That vehicle was tracked traveling south toward New York City, consistent with information provided to the police by neighborhood sources who reported that victim B had been taken to New York City.
Viewed in its totality, this circumstantial proof established, by clear and convincing evidence, that defendant, with assistance from others, engaged in misconduct rendering victim B unavailable to testify (see People v Geraci, 85 NY2d at 370; People v Kellum, 233 AD3d at 1377-1378; People v Jernigan, 41 AD3d 331, 332-333 [1st Dept 2007], lv denied 9 NY3d 923 [2007]; People v Major, 251 AD2d 999, 999-1000 [4th Dept 1998], lv denied 92 NY2d 927 [1998]). The evidence demonstrated that defendant recognized the import of victim B to the People's case and that she disappeared shortly after he obtained the People's discovery and discussed his desire for her not to testify. The proof also suggested that the uncle, having discussed the situation with defendant, orchestrated victim B's departure from the area. We are unpersuaded by defendant's arguments that the People did not undertake sufficient efforts to locate victim B and were required to seek a material witness order to secure her appearance (see People v Kellum, 233 AD3d at 1378).
We also reject defendant's claim that his trial counsel was ineffective (see generally People v Benevento, 91 NY2d 708, 711-714 [1998]; People v George, 242 AD3d 1447, 1451 [3d Dept 2025], lv denied 45 NY3d 945 [2026]). Contrary to defendant's contention, counsel provided meaningful representation in relation to the admission of victim B's grand jury testimony by opposing the People's request for a Sirois hearing in the first instance, and thereafter appropriately cross-examining witnesses during the hearing and zealously advocating that the People's circumstantial proof failed to demonstrate misconduct on the part of defendant. Counsel likewise was not ineffective for failing to request [*6]a jury charge that the bystander was an accomplice as a matter of law, as the evidence adduced at trial did not support such a charge (see CPL 60.22 [2]; People v Caban, 5 NY3d 143, 152 [2005]). Defendant's further argument that counsel was deficient for failing to challenge the legal sufficiency of the count of attempted murder in the first degree has been rendered academic in light of our dismissal of that count.
Finally, defendant's claim that his sentence was harsh and excessive is without merit. As we have vacated defendant's conviction for attempted murder in the first degree, we view this argument solely as it pertains to the sentences imposed for the three remaining charges attempted murder in the second degree and two counts of assault in the first degree which resulted in an aggregate prison term of 50 years. Given the heinous nature of the crimes, together with defendant's extensive criminal history and his failure to express any acceptance of responsibility or remorse for his actions, we find that the sentences imposed were wholly warranted (see People v Smith, 242 AD3d 1370, 1373 [3d Dept 2025], lv denied 45 NY3d 939 [2026]; People v Dorvil, 234 AD3d 1106, 1117 [3d Dept 2025], lv denied 44 NY3d 982 [2025]).
Garry, P.J., Powers and Mackey, JJ., concur.
ORDERED that the judgment is modified, on the facts, by reversing defendant's conviction of attempted murder in the first degree under count 1 of the indictment; said count dismissed and the sentence imposed thereon vacated; and, as so modified, affirmed.