*72 OPINION OF THE COURT
Chief Judge Kaye.
Whenever the People allege specific facts which demonstrate a “distinct possibility” that a criminal defendant has engaged in witness tampering, the court must grant a Sirois hearing to test the validity of that claim (see, Matter of Holtzman v Hellenbrand, 92 AD2d 405, 415; see also, People v Geraci, 85 NY2d 359). Defendant challenges his conviction for second degree murder and related crimes primarily on the ground that the trial court’s ruling after a Sirois hearing was flawed in several *73 respects. Perceiving no error warranting a new trial, we affirm the Appellate Division order upholding the conviction.
I.
At defendant’s March 1996 trial for the shooting death of Steven Davilla in New York City, the prosecution planned to call eyewitness Anthony Echevarria, a 22-year-old neighborhood resident who knew both defendant and the victim. The People indicated in pretrial disclosure to defense counsel and in their March 15 opening statement that Echevarria would testify that he was present at the time Davilla was shot and that defendant was the shooter. Echevarria had met with prosecutors and the police on March 13 and 14, at which time he had identified defendant as the shooter.
On March 17, the day before he was to testify, Echevarria, then incarcerated at Hikers Island on an unrelated charge, telephoned the lead prosecutor and left a voicemail message that he would no longer testify as to the shooter’s identity. He said that his family was “in jeopardy” and “everything is off, I’m not doing nothing. You put me on the stand, do whatever you got to do but I don’t know nothing. I didn’t see nothing * * * Forget everything.”
After informing the trial court of this development the next morning, the prosecution met with Echevarria, at which time the witness promised that he would tell the truth about what he had seen. When called at trial later that day, however, Echevarria once again claimed he could not identify the shooter and asked to speak to the Trial Judge. As he told her:
“Spanish Harlem is a small place, okay. My family lives there. All right. I don’t live there. Okay.
“Steven was a friend of mine, a good friend of mine.
All right.
“Now, see, I got to think about my family, all right. Even though I’m not going to live there, my family is going to be there, you know what I’m saying.”
The People at that point noted that Echevarria had told a prosecutor that some men had approached members of his family and gave them reason to believe that there was a “contract” out on him, and they moved to introduce the prior statements Echevarria had made to law enforcement officials implicating defendant. The court ordered a Sirois hearing to test the People’s assertion that defendant had intimidated Echevarria.
*74 At the hearing, the People called Police Officer Wilson Vargas and Detective Hedxan Quinones, who had been present at the March 13 and 14 trial preparation sessions. They testified that at the first session the prosecutor confronted Echevarria with a written statement he had made to the police shortly after the murder in which he gave a false name and did not identify the shooter; Echevarria responded that he had been scared at the time. In each of the sessions, according to these witnesses, Echevarria described the events he saw the night of the shooting, relating that while he was using a telephone on the corner, he saw defendant cross the street in a crouched manner, holding his hand close to his side. When he reached the corner, defendant approached Davilla, said “What’s up now, money?” pointed a gun at Davilla and shot him. Davilla fell backward, stumbled and attempted to run away. Defendant followed, continuing to fire shots. Defendant then turned around, looked at Echevarria face-to-face, pointed the gun at him without firing, and fled. Vargas and Quinones further testified that during the two sessions, Echevarria was seated in a chair, was not in handcuffs, did not appear nervous, demonstrated a positive frame of mind, engaged in conversation without any sign of discomfort and was not promised anything for his trial testimony.
Officer Vargas testified, additionally, that he and a prosecutor met with Echevarria again on March 20, two days after Echevarria testified that he could not identify the shooter, but before the Sirois hearing. Echevarria said at that meeting that early on the day before he was to testify, he spoke by telephone to his fiancée. She had expressed fear for herself and her child, and told him that someone had approached his mother and sister and inquired as to his whereabouts. Echevarria said that he was afraid “something might happen to [his] family” if he testified and that “there would probably be a contract” out on him.
Detective Quinones further testified that he had spoken with Echevarria’s mother and sister a few days before the Sirois hearing. The sister told Quinones that a few days earlier, unidentified people from her neighborhood had approached her and asked her exactly where Echevarria was being housed in Rikers Island. She told the detective that “word on the street” was that her brother “was talking.” She added that she knew defendant’s family had “killed a family a while ago” and that if anyone talked against defendant’s family, they would be killed.
When called by the People at the Sirois hearing, both Echevarria and his sister denied the statements attributed to them *75 indicating that threats had been made. The sister denied that she had been harassed, and denied telling Detective Quinones or her mother about a conversation with the harassing party. Moreover, although testifying that she knew Richie Cotto by face, when asked if she could identify him in the courtroom, she answered, several times, “I don’t know.” Echevarria himself reiterated his trial testimony that he could not identify the shooter, and explained the voicemail message by stating that he did not want to testify at trial because he did not want to miss an upstate parole hearing, since that would delay his release date from prison and adversely affect his family.
The People also called Echevarria’s mother as a hearing witness. She testified that prior to the morning of March 17, her daughter had told her that someone had stopped her in the street with her baby and had asked whether her brother was incarcerated. The questioner also stated that Echevarria had “talked” about the murder. Echevarria’s mother testified that her daughter said she was scared and afraid for her brother — a sentiment she had never previously expressed. When her daughter learned that her mother had related this incident to Quinones, she became upset and told her mother that she hád a “big mouth.” .
At the conclusion of the hearing, the trial court announced that the People had met their burden of showing, by clear and convincing evidence, that Echevarria had been intimidated by defendant, that his March 13 and 14 statements would be admitted at trial, and that cross-examination of Echevarria would not be permitted but that the jury would have before it “Echevarria’s live direct testimony as well as his [conflicting] out-of-court statements to the police.” Defense counsel asked whether she would be permitted to question Vargas and Quinones about the “res gestae of the statement,” but otherwise made no objection regarding cross-examination. The Trial Judge later issued a written opinion on the Sirois issues (see, 169 Misc 2d 194).
At trial, Quinones and Vargas testified as to Echevarria’s statements at the March 13 and 14 meetings and were cross-examined by defense counsel. Echevarria did not return to the stand. The jury ultimately returned a guilty verdict. On appeal, the Appellate Division affirmed defendant’s conviction, and we now affirm the order of that court.
II.
In People v Geraci (85 NY2d 359), we held that at a Sirois hearing, the People must demonstrate by clear and convincing *76 evidence that the defendant, by violence, threats or chicanery, caused a witness’s unavailability. If the People meet that burden, the defendant is precluded from asserting either “the constitutional right of confrontation or the evidentiary rules against the admission of hearsay in order to prevent the admission of the witness’s out-of-court declarations” (id., at 366). Contrary to defendant’s argument, we conclude that the People satisfied their heavy burden, so that Echevarria’s out-of-court declarations could be evaluated by the jury.
First, there was sufficient evidence to establish that threats were made against Echevarria. At the Sirois hearing, Quinones and Vargas testified as to Echevarria’s out-of-court statements as well as the interviews with his sister and mother, showing that he was prepared to identify defendant but had been scared into silence. Echevarria and his sister, in their testimony, denied that threats had been made and that they had told police or prosecutors anything about those threats. That credibility clash has been resolved by findings of the Trial Judge (who observed the witnesses) — affirmed by the Appellate Division — that the People’s evidence was credible, the contrary evidence not. In the words of the trial court:
“during his testimony both on March 18 and again at the Sirois hearing, Echevarria appeared to be anxious, uncomfortable and forced in his responses, a demeanor inconsistent with truthfulness and consistent with a state of mind demonstrating a fear of harm to his family or to himself if he should testify against Richard Cotto” (169 Misc 2d 194, 198).
Similarly, the court rejected Echevarria’s sister’s testimony as incredible, finding that it conflicted with the testimony of Quinones and her own mother, as well as with Echevarria’s out-of-court statements. The testimony of Detective Quinones and Officer Vargas, reporting Echevarria’s March 13 and 14 statements, was by contrast found credible. In the courts’ view, Echevarria’s attempts at the Sirois hearing to explain his voice-mail message and March 18 statement to the court were unbelievable and wholly at odds with his panicked voice and demeanor on both occasions.
Second, the evidence is sufficient to link these threats to defendant. Because of “the inherently surreptitious nature of witness tampering” circumstantial evidence may be used to “establish, in whole or in part, that a witness’s unavailability was procured by the defendant” (People v Geraci, 85 NY2d, *77 supra, at 369). Defendant, who knew Echevarria from his neighborhood, was out on bail when the threats were made and had the opportunity to arrange and orchestrate them. Echevarria and his family, moreover, received the threats immediately after it was revealed that he would implicate defendant — thus giving defendant uniquely good reason to want to intimidate Echevarria — and there was no suggestion that anyone else stood to gain from the witness’s silence (see, by contrast, People v Geraci, supra, 85 NY2d, at 369-370). Additionally, as the trial court noted, defendant had previously successfully threatened Echevarria when, at the time of the shooting, he looked him in the eye and pointed a gun at him which prompted Echevarria to give the police a false name and deny being able to identify the shooter. All of these affirmed facts, together, clearly and convincingly link defendant to the threats.[1]
Defendant next challenges the reliability of Echevarria’s statements. He claims that Geraci should be limited to Grand Jury testimony and that, even if discussions with law enforcement officials may be admissible, Echevarria’s statements lack sufficient indicia of reliability to satisfy due process. Again, we perceive no error in the Appellate Division order.
Initially, we are unpersuaded by defendant’s contention that Geraci is limited to admitting prior Grand Jury testimony of an intimidated witness. Although Geraci itself involved Grand Jury testimony, the Court did not limit its reach to those particular out-of-court statements and indeed made clear that it applied to “hearsay evidence such as the Grand Jury testimony” (id., at 368 [emphasis added]). Nor would the policy objectives underlying Geraci be served by foreclosing admissibility of other reliable evidence (see, id., at 367-368; see also, United States v Thai, 29 F3d 785 [2d Cir] [prior statements to police admissible], cert denied sub nom. Lan Ngoc Tran v United States, 513 US 977; United States v Aguiar, 975 F2d 45, 47 [2d Cir] [prior statements to drug enforcement agents and Assistant United States Attorney admissible]).
*78 While surely statements admitted pursuant to Geraci cannot be so devoid of reliability as to offend due process, no such danger is presented here. Echevarria’s statements were repeated only days after they had first been made, were (according to the affirmed findings) lucid and credible, and described in detail defendant’s actions both before and after the shooting. Those same statements were made on two separate occasions, and recounted in the testimony of two witnesses subject to cross-examination, thus making it unlikely that Echevarria was misunderstood. Additionally, the testimony indicated that Echevarria received no special treatment from the police and had no motive to change his original story and put himself or his family at risk. The statements were thus certainly sufficiently reliable for evaluation by the jurors.
Finally, defendant urges that the trial court improperly precluded him from any cross-examination of Echevarria as a result of the Sirois hearing. Indeed, defendant now argues to this Court that the trial court improperly adopted a standard used in Federal courts which, when the People meet their burden at the Sirois hearing, precludes cross-examination of the intimidated witness for all purposes (see, e.g., United States v Aguiar, 975 F2d 45, 47, supra). This contention, however, was not raised by objection before the trial court and is thus unpreserved for our review.[2]
III.
Alternatively, defendant seeks reversal of his conviction on the ground that the trial court erroneously admitted statements of the victim, heard by a police officer and an Emergency Medical Technician in the ambulance on the way to the hospital, under the “excited utterance” exception to the hearsay rule. We conclude that the trial court’s in limine ruling admitting the statements was correct, and do not reach the People’s alternative argument that the statements qualified as dying declarations.
An excited utterance occurs “ ‘ “under the immediate and uncontrolled domination of the senses, and during the brief pe *79 riod when considerations of self-interest could not have been brought fully to bear by reasoned reflection” ’ ” (People v Brown, 70 NY2d 513, 518). While it is critical that statements be made before a declarant had an opportunity to reflect, the relevant time period “ ‘ “is not measured in minutes or seconds” but rather “is measured by facts” ’ ” (People v Vasquez, 88 NY2d 561, 579). The court must examine “not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim” (People v Edwards, 47 NY2d 493, 497). That statements were made in response to an inquiry does not disqualify them as excited utterances but rather is a fact to be considered by the trial court (id., at 498-499).
Here, as found by the trial court and affirmed by the Appellate Division, the victim was severely wounded by a gunshot from close range and attempted to escape additional shots fired at him by defendant. The victim’s injuries were severe enough that he had no discernible blood pressure on his trip to the hospital, leading the attending EMT to conclude that he was going into shock and could die. Although the victim remained lucid for much of his trip in the ambulance, he was in great pain, his condition only worsened and his physical shock and trauma never subsided.[3] It is this extraordinary stress that prevented Davilla from engaging in reflection and gives his statements the necessary indicia of reliability (People v Vasquez, 88 NY2d 561, 579, supra). Neither the short interval between the shooting and the statements, nor the fact that the statements were made in response to questioning was sufficient to interrupt the excitement of the shooting and consequent injuries (People v Brooks, 71 NY2d 877 [2V2-hour delay between injury and statements, prompted by questioning]; People v Brown, 70 NY2d 513, supra [30-minute delay between injury and statements, prompted by questioning]). Thus, we cannot say that the trial court erred as a matter of law in admitting the victim’s statements.
Defendant’s remaining contentions are either unpreserved or without merit.
Accordingly, the order of the Appellate Division should be affirmed.

. Contrary to the dissent, the Court is not setting a new standard by accepting “unsubstantiated visits by unnamed individuals” (dissenting opn, at 86). Here, unlike People v Hamilton (70 NY2d 987), there was well-established motive, opportunity, timing and prior intimidation to link defendant to the threats. Requiring specific identification in situations invariably involving surreptitious conduct permits easy evasion of the principle, and sound public policy, that defendants should neither interfere with witnesses nor benefit from such wrongful conduct.

. While we cannot reach the merits of the unpreserved issue and decide the permissible scope of cross-examination, we cannot let stand the suggestion of the dissent that the trial court “explicitly and inexplicably” rejected a rule of law announced by this Court (see, dissenting opn, at 80, 83). The trial court stated that no “truth-serving function will be served by allowing defendant to cross-examine Echevarria on any subject, under the circumstances here presented” (People v Cotto, 169 Misc 2d 194, 203 [emphasis supplied]).

. While we agree with the dissent that the passage of time is not, in itself, dispositive, the dissent nonetheless implies that the victim spent substantial time being questioned in the ambulance, affording him an opportunity to reflect. To the contrary, the trip from the site of the shooting to the hospital took less than 10 minutes, and the entire exchange between the victim and the police officer took approximately two minutes.