Pigott, J.
(dissenting in part). The majority chooses to set aside defendant’s conviction of attempted murder despite the fact that defendant admitted to firing at his intended target, Herburtho Benjamin. The majority is dissatisfied that the trial court admitted the grand jury testimony of an innocent bystander who, fearing for his family’s safety, refused to testify truthfully notwithstanding the fact that the court learned from the witness’s Sirois hearing testimony that his refusal was induced by defendant. Because the majority’s rationale departs from our long-held jurisprudence concerning the admission of grand jury testimony where the People have established to the trial court’s satisfaction that the defendant’s actions were behind a witness’s unavailability, I dissent. Defendant was not deprived of his Sixth Amendment right to confrontation and there is therefore no need for a retrial on the attempted murder count.
The following testimony was given by the eyewitness at the Sirois hearing: The day before the witness was set to testify against defendant, two of his siblings, who resided across the street from where the shooting occurred, visited him at a federal penitentiary. At that time, neither the witness nor his siblings knew that he was slated to be a witness for the prosecution. Significantly, just one week earlier the People had disclosed to the defense the witness’s identity and the substance of his statements implicating defendant in the shooting.
With no knowledge of his impending testimony, the witness’s 23-year-old brother told the witness that he had been approached by the Israelites and that they had accused the witness of “snitching.” The witness’s sister reported that one Kendrick, who was not an Israelite, told her that Israelite members suspected the witness of snitching, and the brother confirmed her account. Each sibling told the witness that they felt “like they were getting hostility in the neighborhood,” and the wit *180 ness explained to the court that this caused him concern for the safety of his family, given their proximity to where the shooting occurred and the fact that, because of his incarceration, he was unable to protect them from harm. He also explained that, but for the threats made to his siblings, “it would be a different story” and he’d “be willing to testify.”
These threats apparently worked because, when the witness arrived at court the following day, he refused to testify, telling the court that he “didn’t see anything.” Of course, this particular witness had seen plenty, as evidenced by his grand jury testimony that was eventually read into the record during the People’s case-in-chief. That testimony established that he saw defendant step out of the building, light a cigarette and start shooting. His eyewitness testimony established that defendant started shooting first and corroborated the testimony of other eyewitnesses. Thus, he was not an insignificant witness and, in fact, may have been one of the People’s strongest, which explains why defendant would not have wanted him to testify.
Following appropriate procedure, in light the witness’s refusal to testify, the trial court conducted a Sirois hearing, where the witness expressed the reasons for his fear of testifying against defendant as summarized above. The court asked him if he could be compelled to testify if the court held him in contempt and sentenced him to an additional 30 days in jail, but the witness stated that would not change his mind. He was subjected to cross-examination by defense counsel, and remained steadfast in his assertions that threats were made against his family and that he did not want to testify for that reason.
At the conclusion of the hearing, the People argued they had not released the witness’s statements to the defense until the previous week, and it was only reasonable for the court to infer that it was defendant who disclosed to Israelite members that the witness’s anticipated testimony would be damaging to defendant. The trial court agreed, and the Appellate Division affirmed that determination.
Grand jury testimony of an unavailable witness is not admissible as direct evidence against the defendant unless the defendant caused the witness’s unavailability through “violence, threats or chicanery,” thereby precluding the defendant from asserting a violation of his right of confrontation (People v Cotto, 92 NY2d 68, 75-76 [1998], citing People v Geraci, 85 *181 NY2d 359, 366 [1995]). The reasons for allowing such testimony are twofold: a defendant should not benefit from his own wrong, and the integrity of the adversary process mandates deterring defendants from attempting to squelch the damaging testimony of an adverse witness (see Geraci, 85 NY2d at 366, 368). We have deemed such policies “important” enough to allow “circumstantial proof” in light of “the inherently surreptitious nature of witness tampering,” acknowledging that “it would be unrealistic and unnecessarily rigid to adopt a formula that would make it impossible to establish the necessary foundation [for the admission of grand jury testimony] in so many cases” (id. at 369). In my view, the majority’s opinion does just that.
The majority emphasizes that the witness could not “describe who spoke to his brother” and that “the witness never testified that [his sister] was personally approached and threatened,” only that she “heard from someone [named Kendrick] that the Israelites believed the witness was snitching” (majority op at 175). The identity of who exactly made the threats, although undoubtedly helpful, is not required to establish defendant’s link to them because “[Requiring specific identification in situations invariably involving surreptitious conduct permits easy evasion of the principle, and sound public policy, that defendants should neither interfere with witnesses nor benefit from such wrongful conduct” (Cotto, 92 NY2d at 77 n 1). A resourceful defendant need not be a card-carrying member of Mensa to realize that it is in his best interest that the identity of the person making the threats remain a secret, lest the People be able to link the defendant to the individual and, by implication, the threats themselves. Thus, merely because the witness and his siblings were unable to identify who. actually made the threats does not factor into the equation.
The majority asserts that “the only possible connection between defendant and the source of the threats is defendant’s association with the Israelite congregation” and that “more than membership” is required, such as evidence that defendant “controlled the group’s actions, influenced members of the group to act, or that he persuaded any individual Israelite to threaten the witness’s family” (majority op at 176). But not every instance of witness tampering involves a taped jailhouse telephone conversation where the defendant threatens a specific witness (see People v Smart, 23 NY3d 213, 216 [2014]), or a defendant who is out on bail and therefore has “the op *182 portunity to orchestrate [the] intimidation” (Geraci, 85 NY2d at 369; see Cotto, 92 NY2d at 77-78 [defendant out on bail when threats were made and had the opportunity to arrange and orchestrate the threats]). Unlike the defendants in Geraci and Cotto, who knew the witness’s identity months before trial and, in fact, knew that the witness had witnessed the crime, defendant in this case had no idea that this particular witness observed the offense and did not know that he was going to testify until the week before trial.
We have made clear that the absence of direct evidence is not fatal to the People’s proof because “witness tampering is a surreptitious activity rarely admitted by the defendant or the witness” and “few cases will involve direct evidence of this causal link between the defendant’s misconduct and the witness’s refusal to testify or failure to appear in court” (Smart, 23 NY3d at 220, citing Geraci, 85 NY2d at 369; Cotto, 92 NY2d at 76-77). As such, the trial court, after listening to and evaluating the witness’s testimony, is permitted to “infer the requisite causation from the evidence of the defendant’s coercive behavior and the actions taken by the witness in direct response to or within a close temporal proximity to that misconduct” (Smart, 23 NY3d at 220-221, citing Matter of Holtzman v Hellenbrand, 92 AD2d 405, 415 [2d Dept 1983]).
Here, the People proffered sufficient evidence for the trial court to draw a permissible inference that defendant’s misconduct caused the witness to become unavailable. He explained that he was not aware that he would be testifying until that very morning, and that he had been visited by his siblings the day before, which is when he learned of the threats and feared for his family’s safety. It is irrelevant that the witness’s siblings did not tell him that they feared defendant (majority op at 175). The intended effect is to have the prospective witness refuse to testify or suffer an unexpected memory loss, and, here, the witness’s candid statements to the court, tested by the defense on cross-examination, created the obvious inference that defendant played a role in his refusal to testify.
When the witness’s siblings conveyed their concerns to him, neither he nor they knew that he was scheduled to testify the following day, nor did his brother know that he had previously provided information regarding defendant’s case.
But defendant knew both of these things.
The witness did not discuss his potential testimony with any of his family members or any of the inmates with whom he *183 was serving time. When the siblings disclosed the threats to him, the defense had been in possession of his statements for a week. Given this testimony, the court reasonably inferred that defendant was behind the threats, and those inferences should not be disturbed by this Court.
The majority states that “[e]ven if the inference of a communication were appropriate on this record” — (and it clearly is) — “the additional inference that the communication was necessarily intended and structured to procure the witness’s unavailability is based on nothing more than pure speculation” (majority op at 175). Given all of the facts, and in light of the witness’s decision to not testify and his stated reasons, the trial court drew the inference that threats made to his family days before trial, after the defense learned of his damaging statements, were caused at the direction of defendant. That is the factfinder’s job, not ours.
The majority insists that it is not adopting a new standard (majority op at 176), but given its interpretation of our jurisprudence in this area, it clearly is. We are turning an evidentiary determination into a trial within a trial. Simply put, the majority’s holding rewards surreptitious conduct by defendants, allowing them to tamper with and intimidate witnesses so long as they do it quietly without leaving a trail that leads to the defendant. The trial court here made a permissible, logical inference, and the Appellate Division agreed. Those determinations should be affirmed.
This witness was an unconnected and unbiased eyewitness. The jury, apparently crediting his grand jury testimony that he was in an apartment across the street from the shooting and witnessed defendant fire the first shot, convicted defendant not only of two counts of second-degree murder, but also of attempted murder in relation to his shooting at Benjamin.
Defendant will receive a new trial on the intentional and depraved indifference murder counts because the trial court erred in charging those counts in the conjunctive. But there is no reason to tamper with the attempted murder count as it relates to defendant’s criminal conduct toward Benjamin. The jury found that defendant, without justification and with the intent to cause Benjamin’s death, attempted to cause his death. The witness’s testimony that defendant shot first supports that conclusion. Now, upon a retrial, that testimony will be withheld from the jury. The grand jury testimony will not be admis *184 sible and a new jury will be asked to make a determination without that eyewitness testimony.
Chief Judge Lippman and Judges Abdus-Salaam and Stein concur; Judge Pigott dissents in part in an opinion in which Judges Read and Fahey concur.
Order modified by remitting to Supreme Court, Kings County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.