People v Ortiz (2021 NY Slip Op 05726)





People v Ortiz


2021 NY Slip Op 05726


Decided on October 20, 2021


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on October 20, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

WILLIAM F. MASTRO, J.P.
ROBERT J. MILLER
COLLEEN D. DUFFY
LARA J. GENOVESI, JJ.


2017-01023
 (Ind. No. 33/15)

[*1]The People of the State of New York, respondent,
v
Mark Ortiz, appellant.


Patricia Pazner, New York, NY (Joshua M. Levine of counsel), for appellant, and appellant pro se.
Michael E. McMahon, District Attorney, Staten Island, NY (Morrie I. Kleinbart and Alexander Fumelli of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Richmond County (Mario F. Mattei, J.), rendered January 11, 2017, convicting him of murder in the second degree and criminal possession of a weapon in the second degree (two counts), upon a jury verdict, and sentencing him to an indeterminate term of imprisonment of 22 years to life on the conviction of murder in the second degree, a determinate term of imprisonment of 5 years followed by 5 years of postrelease supervision on the conviction of criminal possession of a weapon in the second degree under count 2 of the indictment, to run concurrently with all other sentences, and a determinate term of imprisonment of 8 years followed by 5 years of postrelease supervision on the conviction of criminal possession of a weapon in the second degree under count 3 of the indictment, to run consecutively to the sentence imposed for murder in the second degree and concurrently with the sentence imposed for criminal possession of a weapon in the second degree under count 2 of the indictment.
ORDERED that the judgment is modified, on the law, by providing that all sentences shall run concurrently with each other; as so modified, the judgment is affirmed.
On February 15, 2015, Anna Striano had a small gathering at her apartment where attendees drank alcohol, smoked marijuana, conversed, and listened to music, while Striano's children slept in the bedroom. The gathering was attended by, among others, the victim, Barry Lovelace, who was Striano's boyfriend, Lovelace's cousin, Jasmine Sanders, the defendant, Mark Ortiz, who was also known as "DooDoo," and the defendant's friend, Kiwan Smith. At the end of the evening, as some of the attendees began to leave, Lovelace, Sanders, the defendant, and Smith remained at the apartment. Lovelace had his 9 millimeter pistol with him. He and the defendant played with the pistol, passing it back and forth to each other. However, when Sanders requested that they put the pistol away, the defendant put the pistol in his jacket pocket.
Sometime after midnight, Lovelace laid down on the couch and announced that he was ready to go to bed. Smith and the defendant rose to leave. Smith put on his jacket and walked to the door. Smith testified that he saw the defendant remove the pistol from his jacket pocket and assumed the defendant intended to return it to Lovelace. Instead, the defendant pointed the pistol at Lovelace and shot him. Smith ran to the apartment door and heard another shot. He then ran to the staircase of the apartment building, immediately followed by the defendant, and they exited the building. Striano testified that she heard shots, turned, saw the defendant holding the pistol, and ran [*2]to the kitchen to hide. Lovelace crawled into the kitchen behind her. Striano heard Smith and the defendant leave the apartment, and quickly locked the apartment door behind them. Sanders testified that she heard the commotion from the bathroom, where she was on the telephone. She exited the bathroom and saw Striano at the apartment door—Striano stated that "DooDoo" shot Lovelace. Sanders saw Lovelace on the floor of the kitchen, laid down next to him, lifted his head, and asked, "Who did this to you, who did this to you?" Lovelace responded, "DooDoo."
Striano tried to call Lovelace's father and another individual who was in attendance earlier. She testified that "[i]t was two calls then I dialed 911." Striano told the 911 operator that Lovelace had been shot. The 911 operator asked Striano who had shot Lovelace, and Striano stated that she did not know. She testified that she said that because "I didn't think it mattered to 911 for the EMS to get there. I just wanted them to hurry up."
Officer Brian Bunyan and Detective Eric Torres were among the emergency personnel who responded to the scene. Officer Bunyan testified that he arrived at the apartment at approximately 1:44 a.m., saw Lovelace lying unconscious on the kitchen floor, and requested an expedited ambulance. He saw Striano and Sanders arguing with each other. When asked at the trial what they were arguing about, Sanders testified that she "just thought that [Striano] . . . didn't have a reaction enough" to the fact that Lovelace had been shot. Sanders testified that, while the emergency medical service (hereinafter EMS) technicians were examining Lovelace, she either yelled at or attacked Striano, prompting the EMS technicians to ask Sanders to leave the apartment. The EMS technicians pronounced Lovelace dead at the scene. Detective Torres testified that he arrived at the apartment at 2:30 a.m., approximately an hour after the incident. An officer told him that a witness was in the bedroom waiting to speak to him. He proceeded into the bedroom and found Striano, who was "agitated," "excited," "upset," and "nervous, pacing back and forth." Her hands were shaking and she was looking for a cigarette. The detective asked her what happened and she replied, "I can't believe, I can't believe DooDoo shot Barry, they were friends."
The People also presented evidence that the defendant held a grudge against Lovelace, who had previously been arrested, but never indicted, for the fatal shooting of the mother of the defendant's best friend.
After trial, the defendant was convicted of one count of murder in the second degree, as an intentional murder, and two counts of criminal possession of a weapon in the second degree (see Penal Law §§ 125.25[1]; 265.03[1][b]; [3]). The defendant appeals.
The defendant's contention that the evidence was legally insufficient to support his convictions because the People failed to prove that he acted with the intent to kill Lovelace or to possess a weapon is unpreserved for appellate review (see CPL 470.05[2]; People v Hawkins, 11 NY3d 484, 491-492). In any event, viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. In fulfilling our additional responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15[5]; People v Danielson, 9 NY3d 342), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Mateo, 2 NY3d 383, 410; People v Bleakley, 69 NY2d 490, 495). Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (see People v Romero, 7 NY3d 633).
Before the trial, a hearing was held on the People's motion in limine which sought permission to admit Striano's statements to Detective Torres into evidence as an excited utterance (see People v Prashad, 297 AD2d 352). After the hearing, the Supreme Court granted the People's motion, holding that the statements "fit[ ] into" the permissive definition of "excited utterance." "'A spontaneous declaration or excited utterance—made contemporaneously or immediately after a startling event—which asserts the circumstances of that occasion as observed by the declarant is an exception to the prohibition on hearsay'" (People v Morris, 189 AD3d 1077, 1079, quoting People v Cummings, 31 NY3d 204, 209 [internal quotation marks omitted]; see People v Edwards, 47 NY2d 493, 498). "[T]here can be no definite or fixed period of time within which the declaration must have been made, and each case must depend upon its own circumstances" (People v Johnson, 1 NY3d 302, 306). "The test is whether the utterance was made before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the [*3]reflective powers to be yet in abeyance" (id. at 306, quoting People v Brown, 70 NY2d 513, 518). "Ultimately, 'the time for reflection is not measured in minutes or seconds, but rather is measured by facts'" (People v Johnson, 1 NY3d at 306, quoting People v Vasquez, 88 NY2d 561, 579). "The decision to admit hearsay as an excited utterance is an evidentiary decision, 'left to the sound judgment of the trial court'" (People v Cummings, 31 NY3d at 208, quoting People v Hernandez, 28 NY3d 1056, 1057).
Here, Striano was present when her boyfriend was killed, inside her own apartment, while her children slept in the next room. Notwithstanding the fact that there was an interval of time between the incident and Striano's statements to Detective Torres, the fact that she made telephone calls to Lovelace's family and to the 911 emergency number, and the fact that Striano had a disagreement with Sanders, the statements in question were made while the parties were still within the apartment, bustling with emergency personnel responding to the scene, where the victim's body remained. Further, Detective Torres testified at the hearing that when he first saw Striano she was "yelling out," "pacing back and forth," her "hands were shaking," and she was "visibly nervous, upset." Therefore, the record demonstrates that the statements were made while the nervous excitement dominated, before there was time to contrive and misrepresent (see People v Johnson, 1 NY3d at 306), and that Striano lacked the reflective capacity for fabrication (see People v Cotto, 92 NY2d 68, 78-79). Moreover, there was "an added assurance of reliability" since Striano also was a trial witness and therefore subject to cross-examination (see People v Buie, 86 NY2d 501, 512; People v Caviness, 38 NY2d 227, 232). Accordingly, the Supreme Court properly granted the People's motion for permission to admit Striano's statements to Detective Torres into evidence as an excited utterance.
The defendant failed to preserve for appellate review his contention that the Supreme Court erred in allowing the People to elicit prior consistent statements from two witnesses, as he failed to raise any such issue at trial in a timely fashion (see CPL 470.05[2]; People v Lopez, 82 AD3d 1264). In any event, the defendant's contention is without merit.
The defendant's related contention that certain allegedly improper comments made by the prosecutor during his summation deprived him of due process and a fair trial is unpreserved for appellate review (see CPL 470.05[2]; People v Osorio, 49 AD3d 562, 563-564). In any event, the challenged remarks were fair comment on the evidence, or remained within the broad bounds of rhetorical comment permissible in summations, and constituted a fair response to the summation of defense counsel (see People v Flowers, 102 AD3d 885, 886).
The defendant's contention that he was deprived of the effective assistance of counsel is without merit (see People v Benevento, 91 NY2d 708; People v Georgiou, 38 AD3d 155). "'There can be no denial of effective assistance of trial counsel arising from counsel's failure to make a motion or argument that has little or no chance of success'" (People v Benjamin, 188 AD3d 715, 716, quoting People v Caban, 5 NY3d 143, 152 [internal quotation marks omitted]). "The defendant's disagreement with the strategies and tactics employed by the defense counsel does not amount to a deprivation of effective assistance of counsel" (People v Palacios, 295 AD2d 452, 452).
However, we agree with the defendant's contention that the Supreme Court erred in directing that the sentence imposed upon one of his convictions of criminal possession of a weapon in the second degree run consecutively to the sentence imposed upon his conviction of murder in the second degree. The evidence adduced at trial did not establish that the defendant possessed the gun for an unlawful purpose unrelated to shooting at the intended victim, resulting in the death of the victim (see Penal Law § 265.03[1][b]; People v Wright, 19 NY3d 359, 365; People v Hamilton, 4 NY3d 654, 658-659), or that his possession of the gun was separate and distinct from his shooting of the victim (see Penal Law § 265.03[3]; People v King, 172 AD3d 1098, 1099). Accordingly, the terms of imprisonment imposed upon both of the defendant's convictions of criminal possession of a weapon in the second degree should run concurrently with the sentence imposed upon his conviction of murder in the second degree.
The sentence imposed, as modified, was not excessive (see People v Suitte, 90 AD2d 80).
The defendant's remaining contentions are without merit.
MASTRO, J.P., MILLER, DUFFY and GENOVESI, JJ., concur.
ENTER:
Maria T. Fasulo
Acting Clerk of the Court